Laura Christine **FLASKAMP**, Plaintiff,

v.

**DEARBORN PUBLIC SCHOOLS,** a municipal corporation, and Sharon Dulmage, Mary Lane, Aimee Blackburn, Alex Shami, Gerald Stockwell and Pamela Wandless, in their official capacities as members of the Board of Education for the Dearborn Public Schools, and in their individual capacities, Defendants.

No. 01–72404.

United States District Court,
E.D. Michigan,
Southern Division.

Nov. 5, 2002.

Mark H. Cousens, Gillian H. Talwar, Mark H. Cousens Assoc., Southfield, MI, for Plaintiff.

C. John Holmquist, Jr., Rachele S. Lyngklip, Dickinson Wright, Bloomfield Hills, MI, Suzanne P. Bartos, Plunkett & Cooney, Detroit, MI, Kathryn S. Wood, Emily M. Robinson, Dickinson Wright, Detroit, MI, for Defendants.

## OPINION AND ORDER

ZATKOFF, Chief Judge.

## I. INTRODUCTION

This matter is before the Court on Plaintiff's Motion for Summary Judgment, and Defendants' Motion for Summary Judgment. Both motions have been fully briefed. The Court heard oral arguments on the issues presented on October 29, 2002, at the Federal Building and U.S. Courthouse in Port Huron, Michigan. For the reasons set forth below, Plaintiff's Motion for Summary Judgment is DENIED; and Defendants' Motion for Summary Judgment is GRANTED.

## II. BACKGROUND

Plaintiff was a physical education teacher at Fordson High School (hereinafter "Fordson") from 1997 until 2001. Teachers in the Dearborn Public Schools—the school district that governs Fordson—are eligible to receive tenure after a four year probationary period. *See* MICH. COMP. LAWS § 38.81(1). The Dearborn Public School Board (hereinafter "Board"), however, voted to deny Plaintiff tenure at the end of her four years because of a relationship that she had with a former student, Jane Doe II,[1] that the Board found to be inappropriate, and because Fordson's principal, Mr. Paul Smith, stated that he could no longer trust Plaintiff.

Jane Doe II graduated from Fordson in June 2000. In her final semester at Fordson, Jane Doe II registered for a "leadership" class, which gave students the opportunity to assist physical education instructors in teaching physical education classes. Jane Doe II had registered to assist Plaintiff. Prior to that time, Jane Doe II had only isolated contact with Plaintiff; however, over the course of the semester, Jane Doe II and Plaintiff began some type of friendship. Jane Doe II turned eighteen in May 2000, while she was still Plaintiff's student. Over the course of the last few months of the semester, Plaintiff and Jane Doe II

---

1. Jane Doe II and her mother, Jane Doe I, are third parties to this action. They filed a motion for a protective order requiring the use of pseudonyms. On February 6, 2002, Magistrate Carlson entered an order granting the motion for a protective order, and ordered that the witnesses who are the subject matter of the motion are to be referred to as Jane Doe I and Jane Doe II in all pleadings and discovery. Magistrate Carlson's order, however, does not apply to motions. Despite that, neither Plaintiff nor Defendants referred to Jane Doe I or Jane Doe II by their actual name in their present motions. Thus, up until this point in the action, neither name has been made public. Because the Court sees no need to divulge the name of Jane Doe I or Jane Doe II at this point, and because of the embarrassment that both Jane Doe I and Jane Doe II will potentially suffer if their names are made public, the Court shall use pseudonyms in this opinion and order.

exchanged a few notes and cards. Plaintiff gave Jane Doe II a card for her birthday, as well as a card wishing the latter good luck on her performance in a choir concert. Plaintiff left a note on Jane Doe II's car, and gave Jane Doe II a graduation card. In addition, Plaintiff gave gifts to Jane Doe II, including a day planner—which Plaintiff gave to all of her physical education assistants—as well as a toy gun for Jane Doe II's graduation.[2] Before she graduated, Jane Doe II also sent one note to Plaintiff.

In addition to the cards and notes, Jane Doe II started to spend time with Plaintiff outside of their scheduled class time, and had met Plaintiff in a park once prior to graduation. Jane Doe II also gave her email address to Plaintiff. Shortly thereafter, the two began exchanging messages over email. Further, Plaintiff and Jane Doe II began sending instant electronic messages to each other by using their computers. While Jane Doe II was still a student, Plaintiff told Jane Doe II via electronic communication that she was "gay." In a separate electronic communication, Plaintiff sent Jane Doe II an "inappropriate joke" containing sexual innuendos. Inadvertently, however, Jane Doe II's mother, Jane Doe I, happened to see the inappropriate joke. Irate, Jane Doe I sent Plaintiff a message, stating that she thought the joke was offensive, and demanded an apology. Plaintiff apologized to Jane Doe I.

The relationship between Plaintiff and Jane Doe II continued after the latter graduated. Jane Doe II began attending Eastern Michigan University, and was occasionally visited by Plaintiff. In return, Jane Doe II visited Plaintiff at Fordson when she did not have to attend class at Eastern Michigan University. Jane Doe II and Plaintiff continued to exchange email messages, instant electronic messages, and telephone calls for several months after Jane Doe II graduated.

In December 2000, Plaintiff sent Jane Doe II a Christmas card with a personal note written inside. Jane Doe II's mother, Jane Doe I, learned of the Christmas card, and sent Plaintiff a scathing email. The email commanded Plaintiff to stay away from Jane Doe II; if Plaintiff did not heed the command, then Jane Doe I would do everything within her power to get Plaintiff fired and would file a lawsuit against Plaintiff. Concerned, Plaintiff approached the principal of Fordson, Mr. Paul Smith, and informed Mr. Smith of the email from Jane Doe I.

In their December meeting, Plaintiff told Mr. Smith that Jane Doe I thought that there was a relationship between Plaintiff and Jane Doe II. Plaintiff, however, indicated to Mr. Smith that she merely acted as an advisor towards Jane Doe II. Plaintiff reported that Jane Doe II wanted to discuss matters ranging from advice about college to personal matters, such as stating that she thought her parents were abusive, and that she questioned her religion. Mr. Smith replied by stating that it was not the school's concern whether Plaintiff had a relationship with Jane Doe II after she graduated, and that the school would only be concerned if there was a relationship while Jane Doe II was a student. Plaintiff then told Mr. Smith about the "inappropriate" email that she sent Jane Doe II in May 2000, and stated that she sent it to everyone on her email list; Plaintiff stated that she accidentally included Jane Doe II in the mailing. While Mr. Smith ended the meeting stating that he thought Plaintiff would not have a prob-

**2.** This gift was given to Jane Doe II at her graduation party, which happened shortly after Jane Doe II graduated.

lem, he advised Plaintiff to end the relationship with Jane Doe II because it could lead to future problems. Shortly after the meeting, Mr. Smith informed Mr. Karl Steuf, the human resources director for Dearborn Public Schools, about Plaintiff's concerns. In a subsequent telephone conversation, Mr. Steuf told Plaintiff that she had little to worry about; however, he repeated Mr. Smith's advice to stay away from Jane Doe II.

A few months later, in the spring of 2001, the Board was to decide whether to grant Plaintiff tenure. The Board routinely followed the recommendations of the school district's administration when making tenure decision. Consequently, Mr. Smith was to make an evaluation of Plaintiff, and make a recommendation to the Board regarding whether Plaintiff should receive tenure. On March 15, 2001, Mr. Smith issued a written evaluation stating that Plaintiff's performance was satisfactory, and recommended that Plaintiff receive tenure. Within two weeks, however, Mr. Smith issued a superceding evaluation in which he stated that Plaintiff's performance was unsatisfactory, and changed his recommendation regarding tenure; he recommended that the Board deny tenure.

Mr. Smith's sudden change of mind was triggered by a conversation with Jane Doe I. Jane Doe I alleged that "a series of things that she saw as very wrong [ ] had taken place when the girl was a student at Fordson ...." *See* Smith's Deposition, 49. In short, Jane Doe I alleged that Plaintiff began an inappropriate relationship with Jane Doe II while Jane Doe II was still a student, and continued that relationship through the then-present time. Jane Doe I stated that she had printed off a copy of an instant electronic message dialogue that occurred between Jane Doe II and Plaintiff on March 14, 2001, and one that occurred on March 15, 2001—roughly nine months after Jane Doe II graduated. The

March 15, 2001, dialogue contains a number of sexual innuendos, such as a reference to taking a shower together, and spending the night together. Jane Doe I also told Mr. Smith about the inappropriate email that Plaintiff sent Jane Doe II in May 2000. Jane Doe I, however, contradicted Plaintiff's statement that Plaintiff inadvertently sent it to everyone on her email list; Jane Doe I stated that the email was specifically addressed only to Jane Doe II. Jane Doe I further contradicted Plaintiff by stating that Plaintiff sent Jane Doe II ten to fifteen cards and notes while Jane Doe II was a student; Jane Doe I, however, never produced these cards and notes. Finally, Jane Doe I told Mr. Smith about the frequent meetings between Jane Doe II and Plaintiff at Eastern Michigan University's campus, and generally concluded that Plaintiff was "chasing after" Jane Doe II.

Within a few days, Mr. Smith had a second conversation with Jane Doe I. This time, Jane Doe I reported that Plaintiff had a confrontation with her son—Jane Doe II's brother. Basically, Plaintiff and Jane Doe II's brother encountered each other in a classroom; allegedly, Plaintiff repeatedly asked Jane Doe II's brother how Jane Doe II was doing. In response to the persistent questioning, the brother allegedly yelled at Plaintiff and told her to shut up; the brother told Plaintiff that it was none of Plaintiff's business, and told Plaintiff to leave Jane Doe II alone, or else he would slap Plaintiff.

Twice within the two weeks following March 15, 2001, Mr. Smith asked Plaintiff to respond to Jane Doe I's allegations. In particular, Mr. Smith asked about the instant electronic message conversations that Plaintiff engaged in with Jane Doe II, specifically the two conversations Jane Doe I provided printed copies of. Plaintiff stated that she simply acted as an

advisor to Jane Doe II, encouraged Jane Doe II, and discussed a meeting place with Jane Doe II. Mr. Smith, however, was aware that the instant electronic message conversations contained several sexual references. In general, Mr. Smith was displeased with Plaintiff's responses, particularly Plaintiff's insistence that the relationship was only an advisory one. Between his conversation with Plaintiff in December 2000, and his two conversations with Plaintiff in March 2001, Mr. Smith believed that Plaintiff was not being fully forthright because Plaintiff was not disclosing all of the important details about her relationship with Jane Doe II, particularly while the latter was a student. He informed Mr. Steuf of his concerns; they agreed that Plaintiff should be suspended, that her evaluation should be changed, and that they should recommend that the Board deny Plaintiff tenure.

On April 9, 2002, the Board convened. The Board held a hearing in which it heard from, among others, Plaintiff's attorney. Afterwards, the Board, acting per its norm, followed Mr. Smith's recommendation and denied Plaintiff tenure. Of the six board members that voted to deny Plaintiff tenure, two, Defendant Alex Shami and Defendant Mary Lane, premised their vote on their belief that Plaintiff had a sexual or romantic relationship with Jane Doe II before she graduated. Two others, Defendant Gerald Stockwell and Defendant Pamela Wandless, believed that Plaintiff had an "unprofessional," or "improper," relationship with Jane Doe II while the latter was a student. In addition, Wandless, along with Defendant Aimee Blackburn, relied on Mr. Smith's statements that Plaintiff was untrustworthy; Blackburn based her decision solely on Mr. Smith's determination that Plaintiff did not fully disclose all relevant facts. Finally, Defendant Sharon Dulmage was unable to remember why she voted against Plaintiff, however, she did state that she

relied on Mr. Smith's letter and recommendation.

Plaintiff alleges in her complaint that "Plaintiff was denied tenure and discharged because individual Defendants did not approve of Plaintiff's association with another adult or the nature of the interaction Plaintiff had with this other adult." *See* Plaintiff's Complaint, ¶ 14. This violated certain constitutionally guaranteed rights: her right of intimate association, her right to privacy, and her right to substantive due process. *See id.* at ¶ 15.

### III. LEGAL STANDARD

Summary judgment is appropriate only if the answers to interrogatories, depositions, admissions, and pleadings combined with the affidavits in support show that no genuine issue as to any material fact remains and the moving party is entitled to a judgment as a matter of law. *See* FED. R. CIV. P. 56(c). A genuine issue of material fact exists when there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted). In application of this summary judgment standard, the Court must view all materials supplied, including all pleadings, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

The moving party bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that establish the absence of a genuine issue of material fact.

*See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial. *See* FED. R. CIV. P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. The non-moving party must do more than show that there is some metaphysical doubt as to the material facts. It must present significant probative evidence in support of its opposition to the motion for summary judgment in order to defeat the motion for summary judgment. *See Moore v. Philip Morris Co.,* 8 F.3d 335, 339–40 (6th Cir.1993).

## IV. ANALYSIS

■ Plaintiff alleges that the individual Defendants, who were all members of the Board, violated three of her constitutional rights. 42 U.S.C. § 1983 protects individuals from the deprivation of "any rights, privileges, or immunities secured by the Constitution ..." by state actors. 42 U.S.C. § 1983. In order to make a successful claim under § 1983, Plaintiff must establish that: 1) she was deprived of a right secured under the Constitution or laws of the United States, 2) the deprivation was caused by a person acting under color of state law, and 3) the deprivation occurred without due process of law. *See Rhodes v. McDannel,* 945 F.2d 117, 119 (6th Cir.1991).

■ In addition to the individual Defendants, Plaintiff also names the Dearborn Public Schools as a Defendant. The Dearborn Public Schools is a municipal government. *See Lucero v. Detroit Public Schools,* 160 F.Supp.2d 767, 779 (E.D.Mich.2001). In general, municipalities do not enjoy either absolute or qualified immunity from suit. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 166, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). A municipality, however, cannot be held liable under 42 U.S.C. § 1983 unless a municipal policy or custom caused the constitutional injury. *See id.* A municipal policy is an action that is passed by the municipality's duly constituted legislative body. *See Board of Comm'rs of Bryan County, Okl. v. Brown,* 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). In other words, a municipality cannot be held liable under a theory of respondeat superior. *See Leatherman,* 507 U.S. at 166, 113 S.Ct. 1160.

In sum, Plaintiff can bring a successful action under § 1983 if she was deprived of a constitutional right by individuals acting under color of state law, and that she was deprived of her constitutional rights without the due process of law. As stated above, Plaintiff alleges that she had three constitutional rights violated: 1) Plaintiff's right to privacy; 2) Plaintiff's right to intimate association; and 3) Plaintiff's right to substantive due process. The Court shall now address each right in turn.

### A. Right to Privacy

Plaintiff argues that Defendants violated her clearly established right to privacy. Plaintiff argues that individuals have a well established right to privacy, *see Gutierrez v. Lynch,* 826 F.2d 1534, 1539 (6th Cir.1987), which includes the right not to have private information about a person's sexual relationships publically disclosed. *See Bloch v. Ribar,* 156 F.3d 673, 685 (6th Cir.1998). Plaintiff also asserts that she had the right to refuse to cooperate with any investigation into her private matters that the government conducts without sufficient justification. *See Shuman v. City of Philadelphia,* 470 F.Supp. 449, 457 (E.D.Pa.1979).

While Plaintiff concedes that the school has a strong interest in protecting its students, she argues that it does not have any

interest in protecting former students. Plaintiff argues that she was fully forthright with Mr. Smith about her relationship with Jane Doe II before the latter graduated. Moreover, Plaintiff argues that Mr. Smith had no reason to inquire, and Plaintiff had no duty to answer questions, about her relationship with Jane Doe II after she graduated. Despite this, Mr. Smith found that Plaintiff was uncooperative in an investigation, and that he could no longer trust her. Because of this, Defendants terminated Plaintiff.

The Sixth Circuit stated that there are two types of privacy interests: 1) interests involving a individual's interest in making life-shaping decisions, such as marriage, contraception, family relationships, and child rearing; and 2) interests involving an individual's interest in not having disclose personal matters. *See Kallstrom v. City of Columbus*, 136 F.3d 1055, 1060–61 (6th Cir.1998). Here, Plaintiff alleges a violation of the latter. Unlike other circuits, the Sixth Circuit reads an individual's interest in not having to disclose private matters narrowly, and "will only balance an individual's interest in nondisclosure of informational privacy against the public's interest in and need for the invasion of privacy where the individual's privacy is of constitutional dimension." *Id.* at 1061 (citing *J.P. v. DeSanti*, 653 F.2d 1080, 1091 (6th Cir.1981)). Thus, the question for the Court is whether Plaintiff's privacy interest is of a constitutional dimension, and if so, whether her interest in non-disclosure outweighs the public's interest in the information.

The Court finds that Plaintiff has a right to privacy regarding her sexual relationships. Although the Supreme Court has found only a limited number of areas that the right to privacy extends to—marriage, procreation, contraception, family relationships, and child rearing, *see Kallstrom*, 136 F.3d at 1061 (citations omitted)—the Sixth

Circuit has found that the right to privacy also extends to a person's sexual relationships. *See Bloch*, 156 F.3d at 685. Despite this right to privacy in sexual relationships, Defendants could ask Plaintiff about her sexual relationships if they had a reason to know about her relationships, and if the inquiry was narrowly tailored to further that reason. *See Kallstrom*, 136 F.3d at 1064.

Both parties agree that the school board had a very strong interest in protecting the students. Further, Defendants assert, and the Court agrees, that government officials may ask a person about private matters if it impacts upon an individual's job performance. *See Hughes v. City of North Olmsted*, 93 F.3d 238, 242 (6th Cir. 1996); *see also Thorne v. City of El Segundo*, 726 F.2d 459, 471 (9th Cir.1983). Here, Jane Doe I alleged that Plaintiff had an improper relationship with Jane Doe II while the latter was still a student. Thus, it was Mr. Smith's duty to investigate the allegation against Plaintiff. *See Hughes*, 93 F.3d at 242 (citing *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 72–73, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).

Plaintiff concedes that Mr. Smith was permitted to investigate whether Plaintiff had an inappropriate relationship with Jane Doe II while she was still a student. But, Plaintiff contends that Mr. Smith went too far and invaded her right to privacy when he asked Plaintiff in December 2000, and again in March 2001, about the then-present nature of Plaintiff's relationship with Jane Doe II. Plaintiff further contends that by telling Mr. Smith that she only had an advisory relationship with Jane Doe II, she was effectively refusing to answer the question, which she had a right to do. *See Shuman*, 470 F.Supp. at 457. Plaintiff concludes that although she had a right to refuse to cooperate, she was terminated anyway.

Although Plaintiff makes a strong argument, the Court finds that it does not need to decide whether Plaintiff's constitutional right to privacy was violated because Defendants are entitled to qualified immunity. Government officials may be held civilly liable under § 1983 for violating a person's constitutional rights. *See O'Brien v. City of Grand Rapids,* 23 F.3d 990, 995 (6th Cir.1994). Subjecting government officials to personal liability, however, can distract them from their work and inhibit them in their discretionary action; thus, the right to sue government officials is limited. *See Harlow v. Fitzgerald,* 457 U.S. 800, 814, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Government officials, such as the Defendants in this case, are generally immune from liability for performing discretionary functions. *See id.* at 818, 102 S.Ct. 2727. This limitation is better known as qualified immunity. In order to overcome qualified immunity, Plaintiff must show: 1) that she had a clearly established constitutional right; and 2) that " 'the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates the right.' " *See Saucier v. Katz,* 533 U.S. 194, 201–02, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

The Court finds that although Plaintiff had a right to privacy, the contours of that right were not sufficiently clear to have put Defendants on notice that they violated Plaintiff's right. Although the Sixth Circuit stated that there is a right to privacy regarding sexual relationships, *see Bloch,* 156 F.3d at 685, it did so in a case involving a rape victim. In *Bloch,* a sheriff's department held a press conference in which the details of plaintiff's rape were vividly described, much to her humiliation. *See Bloch,* 156 F.3d at 676. Further, there was no purpose to be served by the release of this information; it did not advance the sheriff's case in any way. *See id.* The Sixth Circuit found that the rape victim had a right to not have the details of the rape released unless there was some penological purpose to be served. *See id.* at 686. It was only in this context that the Sixth Circuit made a general statement about an individual's right to privacy about his or her sexual relationships. Moreover, the Sixth Circuit did not discuss the contours of an individual's right to privacy about his or her sexual relationships.

In light of this precedent, the contours of Plaintiff's right to privacy in regards to her sexual relationships were not clearly defined. Further, the Sixth Circuit has held that a government official that asks a person about his or her sexual relationships may be entitled to qualified immunity if the government official reasonably believed that he or she had the right to ask. *See Hughes,* 93 F.3d at 242. In *Hughes,* allegations were made that a police officer was sexually harassing some of his female co-workers, bragged that he and his wife had an "open" marriage, and made unwanted advances. *See id.* at 239–40. The department investigated the alleged misconduct, and both the police officer and his wife were asked about their marriage; in particular, they were asked whether they maintained an open marriage. *See id.* at 240. The Sixth Circuit stated that while there is a right to privacy, that right has yet to be fully defined. *See id.* at 241–42. Given that the right to privacy had not been fully defined, that the police officer's alleged sexual misconduct affected his work performance, and that the allegations against him involved his description of his sexual relationship with his wife, the Sixth Circuit held it was not unreasonable for the department to ask the police officer and his wife about their sexual relationship. *See id.* at 242.

Similarly, it was not unreasonable for Mr. Smith to believe that he had a right to know about Plaintiff's relationship with Jane Doe II after the latter had graduated because Jane Doe I alleged that Plaintiff had an inappropriate relationship with Jane Doe II from before the time Jane Doe II graduated until the then-present time. Further, it was Plaintiff that first approached Mr. Smith in December 2000, after Jane Doe II graduated, about her concerns with the email she received from Jane Doe I. Thus, it was reasonable for Mr. Smith to inquire about Plaintiff's current relationship with Jane Doe II. Consequently, the Court finds that Plaintiff's right to privacy claim against the Defendant Board[3] members fails because Defendants are entitled to qualified immunity.

 As for Defendant Dearborn Public Schools, as mentioned above, the only way it may be held liable is if Plaintiff was denied one of her constitutional rights pursuant to a municipal policy or custom. *See Leatherman*, 507 U.S. at 166, 113 S.Ct. 1160. Plaintiff fails to point to such a municipal policy or custom, either in her brief or at oral argument. Therefore, Plaintiff's claim of a violation of her right to privacy against Defendant Dearborn Public Schools fails.

### B. Right to Intimate Association

Next, Plaintiff argues that her right to intimate association was violated. She argues that under the Constitution, there are two types of freedom of association: 1) the freedom to enter into certain highly personal and intimate relationships with other people; and 2) the freedom to associate in order to carry out a right protected by the First Amendment, such the exercise of religion. *See Roberts v. United States*

*Jaycees,* 468 U.S. 609, 617–18, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). Plaintiff here is alleging an infringement of a highly personal relationship, and that Defendants had interfered with that relationship by terminating Plaintiff for carrying on with her highly personal relationship.

 The Court agrees that the Constitution protects a person's highly intimate relationships. It is unclear, however, whether the relationship at issue is such a highly intimate relationship. In *Roberts,* the Supreme Court described in general terms the types of relationships that are entitled to constitutional protection. It stated: "[w]ithout precisely identifying every consideration that may underlie this type of constitutional protection, we have noted that certain kinds of personal bonds have played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs." *Roberts,* 468 U.S. at 618–19, 104 S.Ct. 3244. These relationships tend to have a small number of people involved, they tend to seclude others from the most critical aspects of the relationship, and the participants tend to be highly selectivity in commencing the relationship. *See id.* at 620, 104 S.Ct. 3244. The Supreme Court stated that family relationships, such as marriage and cohabitation with ones relatives, are examples of these types of highly intimate relationships. *See id.* at 619, 104 S.Ct. 3244. At the opposite extreme are people who associate with one another in a business setting. *See id.* at 620, 104 S.Ct. 3244.

The Court finds that Plaintiff's relationship with Jane Doe II is not the type of relationship that the right of intimate association should be extended to. The Court

---

**3.** Although Mr. Smith performed the investigation that allegedly pried into Plaintiff's personal life, Plaintiff contends that the members of the Board ratified the impermissible investigation, and are thus liable also. The Court finds that they are entitled to qualified immunity for the reasons discussed in the main text.

recognizes that this relationship is small in number—there are only two people involved—and that Plaintiff's relationship with Jane Doe II was selective and exclusive. Further, the two shared private confidences, such as their sexual orientation. Having said as much, the constitutional right to intimate association flows from the Fourteenth Amendment concept of substantive due process, *see IDK, Inc. v. Clark County,* 836 F.2d 1185, 1193 (9th Cir.1988), which is why the central inquiry remains whether this is the type of personal relationship that has "played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs." *Roberts,* 468 U.S. at 618–19, 104 S.Ct. 3244. The Court finds that the "close friendship" that Plaintiff described does not constitute the type of relationship that has played a "critical role" in shaping the Nation's culture. This is especially true in light of precedent from other courts.

While the precise extent of Plaintiff's relationship with Jane Doe II is not clear—particularly whether it was a sexual relationship—precedent from courts outside the Sixth Circuit would indicate that whatever the relationship was, Plaintiff's relationship with Jane Doe II was not protected. Although the United States Supreme Court has left the possibility open, it has yet to extend the right to intimate associations beyond familial relationships. *See City of Bremerton v. Widell,* 146 Wash.2d 561, 51 P.3d 733, 741 (2002). The lower courts that have determined the right to intimate association are similarly limited. For instance, the Washington Supreme Court recently held that an engaged couple that was not cohabitating was not entitled to right of intimate association. *See id.* In making its decision, the Washington Supreme Court catalogued other decisions that have not expanded the right of intimate association beyond familial relationships. *See id.*

For instance, the Washington Supreme Court cited *Rode v. Dellarciprete,* 845 F.2d 1195 (3d Cir.1988), and stated that the Third Circuit held that a non-blood familial relationship short of marriage is not constitutionally protected. *See id.*

One court did find a non-family relationship to be constitutionally protected. In *Wilson v. Taylor,* 733 F.2d 1539 (11th Cir. 1984), the Eleventh Circuit found that a dating relationship is constitutionally protected. That decision, however is widely recognized as overruled. *See Widell,* 51 P.3d at 741 (citing *Swank v. Smart,* 898 F.2d 1247, 1252 (7th Cir.1990)).

Plaintiff argues that the Sixth Circuit recently extended the right to intimate association to non-family relationships in *Bazzetta v. McGinnis,* 286 F.3d 311 (6th Cir.2002). A close reading of *Bazzetta,* however, belies Plaintiff's assertion. In *Bazzetta,* the Michigan Department of Corrections (hereinafter "MDOC") promulgated an number of regulations that prevented certain types of people from visiting prisoners. *See id.* at 315. Among others, the MDOC prevented prisoners from being visited by minors, such as minor siblings, nieces and nephews, and by former prisoners. *See id.* The MDOC reasoned that minor children were difficult for prison guards to supervise, and that prisons are a bad environment for children. *See id.* In addition, the MDOC banned visits by former prisoners because it was concerned about former prisoners smuggling contraband into prisons. *See id.*

The Sixth Circuit found these regulations to be unconstitutional. As for the regulation that prevented prisoners from being visited by minor siblings, nieces, and nephews, the Sixth Circuit wrote that the regulation was overly-broad, and there were less restrictive alternatives. *See id.* at 318–19. In particular, the Sixth Circuit

found that prisoners have a right to intimate associations, particularly with family relationships. *See id.* at 317 ("Close analysis is especially appropriate when, as is the case here, the challenged restrictions interfere with family relationships ...."). The Sixth Circuit held that this regulation had the potential of "straining close family ties." *Id.* at 319. As for the regulation that prevented prisoners from being visited by former prisoners, the Sixth Circuit found that this regulation proved to be a hardship of friends and family, and gave an example of a mother who was not allowed to see her child due to this regulation. *See id.* at 320. Once again, the Sixth Circuit found this regulation to be overly-broad because there were less-restrictive alternatives available. *See id.* at 320.

When discussing the regulation about former prisoners, the Sixth Circuit wrote one sentence commenting on how that regulation has proved to be a hardship on friends and family. From that one sentence, Plaintiff asserts that the Sixth Circuit has extended the right of intimate association to friendships. That one sentence does not support Plaintiff's assertion because the Sixth Circuit did not explicitly find that the right to intimate association extends to non-family members. *See id.* Further, such a holding is not necessarily implied by the Sixth Circuit's opinion because it gave other reasons for finding that the regulation was unconstitutional. *See id.* For instance, the Sixth Circuit found that the regulation needlessly strained family ties, which are clearly protected relationships, and the Sixth Circuit also noted that this regulation prevents visits from social workers, or other legitimate

visitors, who happened to be former prisoners.[4] *See id.* Thus, *Bazzetta* does not support Plaintiff's assertion.

More recent precedent from the Sixth Circuit further undercuts Plaintiff's assertion that intimate friendships are entitled to constitutional protection. In *Marcum v. McWhorter*, 308 F.3d 635 (6th Cir.2002), a deputy sheriff was cohabitating with a married woman that he was in a romantic relationship with. *See id.* at 638–39. While the Sixth Circuit held that this relationship exhibited some of the traits of a constitutionally protected relationship that were identified in *Roberts*, the Sixth Circuit ultimately held that this relationship was not constitutionally protected because of its adulterous nature. *See id.* at 640–41, 104 S.Ct. 3244. Consequently, the Sixth Circuit has yet to extend the right of intimate association beyond familial relationships.

Although it is unclear whether Plaintiff's relationship with Jane Doe II was sexual or not, it does not matter. Even if Plaintiff's relationship with Jane Doe II did have a sexual component, that would not afford the relationship constitutional protection. *See id.* at 641–42, 104 S.Ct. 3244. The United States Supreme Court itself refused to extend the right of intimate association to a homosexual couple engaged in sodomy. *See Bowers v. Hardwick*, 478 U.S. 186, 204–06, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986) (Blackmun, J. dissenting). In light of this precedent, the Court finds that a relationship between close friends, even one with a sexual component to the relationship, is not the type of relationship that has played a critical role is shaping our Nation's culture. Consequently, Plaintiff's argument that she

**4.** Another regulation by the MDOC prevents any visits to a prisoner that has two or more major misconduct charges of substance abuse. *See id.* at 321. The Sixth Circuit lists several reasons that this regulation is unconstitutional, including that it affects relationships with "family and friends outside prison." *Id.* at 322. For the reasons stated in the main text, this does not support Plaintiff's assertion that the right to intimate association was extended beyond the family.

was deprived of her right to intimate association fails.

## C. Substantive Due Process

In her third theory advanced, Plaintiff argues that her substantive due process was violated. Plaintiff argues that while a government has broad latitude in imposing regulations on its employees, there must be a rational reason for every regulation imposed. *See Swank v. Smart*, 898 F.2d 1247, 1252 (7th Cir.1990). Plaintiff argues that she was denied tenure, and terminated from her position, for no rational reason. She argues that there is no evidence that she engaged in an inappropriate relationship with Jane Doe II while the latter was a student. Further, she argues that she did not in fact engage in an inappropriate relationship with Jane Doe II before the latter graduated. Finally, Plaintiff argues that she was completely forthcoming about her relationship with Jane Doe II before the latter graduated. Therefore, Defendants acted to deny Plaintiff tenure, and terminate Plaintiff, without any information upon which to do so.

Defendants argue that their decision was not utterly unreasonable. They argue that they considered the principal's recommendation—especially the fact that he could no longer trust Plaintiff—Jane Doe I's allegations that the relationship began when Jane Doe II was a student, and the incident between Jane Doe II's brother and the Plaintiff. Further, the Board even held a hearing in which Plaintiff's attorney was given a chance to comment. Based on all of this information, as mentioned above, four of the Board members determined that an inappropriate relationship occurred while Plaintiff was still a student.

The Court agrees with Defendants; the members of the Board did not make an unreasoned decision. Instead, they relied heavily on the recommendation of the principal. This is not unusual for members of the school board. As Plaintiff states in her brief in support of her motion for summary judgment: "Administrative recommendations are routinely followed in Dearborn. Paul Smith testified that he had made many recommendations regarding tenure; that the Board of Education had adopted all of them. S/30. Board members testified that they had uniformly adopted such recommendations." *See* Brief in Support of Plaintiff's Motion for Summary Judgment, 2. Given the history of following recommendations, it cannot be said that Defendants' "decision to terminate Plaintiff was utterly without any rational basis . . . ." *Id.* at 21. To the contrary, following the recommendation appears to be an eminently reasonable course of action.

Plaintiff argues that Mr. Smith's recommendation itself was unreasonable, and that he made his decision without any evidence of an improper relationship between Plaintiff and Jane Doe II, or that Plaintiff had failed to be forthright during the investigation. This is not a true statement. Jane Doe I alleged that Plaintiff and Jane Doe II had an inappropriate relationship that began before Jane Doe II graduated, and that it was continuing at the then-present time. Mr. Smith had before him evidence that could lead him to believe Jane Doe I's allegations: Plaintiff and Jane Doe II exchanged some number of notes and electronic messages before Jane Doe II graduated, including the "inappropriate" joke; Plaintiff sent Jane Doe II a Christmas card with a personal note after Jane Doe II graduated; Plaintiff and Jane Doe II met several times after Jane Doe II graduated; there was a printed copy of the instant electronic conversation between Plaintiff and Jane Doe II that contained sexual innuendos, including a discussion about taking a shower together, and spending the night together; and Jane Doe II's brother became very upset at

Plaintiff when the latter asked how Jane Doe II was doing—perhaps showing embarrassment on the part of Jane Doe II's brother. As a whole, these facts are consistent with Jane Doe I's allegations.

In contrast, Plaintiff stated in December 2000 that she merely had an advisory-type friendship with Jane Doe II. Only three months later, however, Mr. Smith became aware of the instant electronic conversation with the sexual innuendos between Plaintiff and Jane Doe II. That instant electronic conversation was not consistent with Plaintiff's representation that she and Jane Doe II were only friends. Plaintiff points out that it appears that there are some lines in the instant electronic conversation that contain nothing but brackets, and could have contained text that was missing. But, the Court finds that Mr. Smith reliance on that instant electronic conversation was not unreasonable; Mr. Smith stated that there did not appear to be anything material omitted from the instant electronic conversation; that the instant electronic conversation made logical sense to him. *See* Deposition of Paul Smith, 70–71. Thus, from this evidence, Mr. Smith was justified in concluding that Plaintiff was less that forthright during the investigation; that her relationship with Jane Doe II was more than merely advisory. Consequently, the Court finds that Mr. Smith's recommendation was not unreasonable.

█ Finally, Plaintiff argues that given Plaintiff's stellar record as an instructor, and the fact that she was originally recommended for tenure before ultimately being denied tenure should have given rise to a duty that the Board investigate the reason for the changed recommendation thoroughly, and hold a hearing. Plaintiff, however, cites neither statutory nor case law to support this assertion. Nor can the Court find such law; in fact, the Court notes that under Michigan law, a teacher in his or her probationary period that is denied tenure is not entitled to a hearing. *See Holton Public Schools v. Farmer,* 77 Mich.App. 765, 259 N.W.2d 219, 222 (1977) (citing *Anderson v. Harper Woods Public School Dist.,* 74 Mich.App. 227, 253 N.W.2d 718 (1977)). One Michigan case has stated: "where the reasons for nonrenewal impugn the good name, reputation, honor or integrity of the individual, a hearing to determine the truth of those charges may well be warranted." *See Thomas v. School Dist. of City of Kalamazoo,* 74 Mich.App. 560, 254 N.W.2d 576, 579 (1977). This statement, however, is merely dicta. Moreover, the Court notes that Plaintiff in fact did get a hearing, in which her attorney was allowed to make a presentation to the Board on her behalf.

Therefore, for the reasons stated above, Plaintiff's argument that her right to substantive due process was violated also fails.

### D. Conclusion

The Court finds that all of Plaintiff's theories for relief fail. Therefore, Plaintiff's motion for summary judgment shall be denied, and Defendants' motion for summary judgment shall be granted.

### V. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment is DENIED. Defendants' Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.

### *JUDGMENT*

IT IS ORDERED AND ADJUDGED that pursuant to this Court's Opinion and Order dated 5 NOV 2002, this cause of action is DISMISSED WITH PREJUDICE.