RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 04a0343p.06

# UNITED STATES COURTS OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

LAURA CHRISTINE FLASKAMP,

        *Plaintiff-Appellant,*

    *v.*

DEARBORN PUBLIC SCHOOLS, a municipal corporation,
and SHARON DULMAGE , MARY LANE, AIMEE
BLACKBURN, ALEX SHAMI, GERALD STOCKWELL, and
PAMELA WANDLESS, in their official capacities as
members of the Board of Education for the Dearborn
Public Schools, and in their individual capacities,

        *Defendants-Appellees.*

No. 02-2435

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 01-72404—Lawrence P. Zatkoff, District Judge.

Argued: June 9, 2004

Decided and Filed: October 5, 2004

Before: BOGGS, Chief Judge; NELSON and SUTTON, Circuit Judges.

———————

## COUNSEL

**ARGUED:** Mark H. Cousens, Southfield, Michigan, for Appellant. Camille Horne, PLUNKETT &
COONEY, Detroit, Michigan, for Appellees. **ON BRIEF:** Mark H. Cousens, Southfield, Michigan, for
Appellant. Christine D. Oldani, PLUNKETT & COONEY, Detroit, Michigan, for Appellees.

———————

## OPINION

———————

    SUTTON, Circuit Judge. Laura Flaskamp taught physical education in the Dearborn Public Schools.
In April 2001, the board of education for the school system denied her tenure after learning that Flaskamp
had a sexual or otherwise-intimate relationship with a former student within nine months of the student's
high school graduation. In acting upon the school principal's recommendation that her tenure application
be denied, the board relied in part on the view that the relationship had begun before graduation and in part
on the view that Flaskamp had failed to be candid in addressing the school system's concerns about the
relationship.

1

Flaskamp sued the school system and the individual board members, claiming that they had violated her right to intimate association, her right to privacy and her right to be free of arbitrary state action—all in violation of the Due Process Clause of the Fourteenth Amendment. The district court granted summary judgment to the defendants on each claim. Because the board in our view did not violate the Due Process Clause in any of these respects in denying Flaskamp's tenure application, we affirm the district court's judgment in favor of the board, its members and the school system.

**I.**

In 1997, the Dearborn Public Schools hired Laura Flaskamp as a physical education teacher and assigned her to one of the schools within the district, Fordson High School. Under Michigan law, Flaskamp had to serve a four-year probationary period before she was eligible for tenure. *See* Mich. Comp. Laws § 38.81(1).

In the spring of 2000, Jane Doe, a 17-year-old senior at Fordson High School, enrolled in a leadership class that gave students an opportunity to assist physical education instructors in teaching their classes. Doe registered to serve as Flaskamp's teaching assistant. *Id.*

As the semester proceeded, Doe and Flaskamp not only communicated with each other during the class but also began to communicate with each other outside of class through e–mail and instant messages. A friendship developed and by the end of the school year the two had given each other several cards and gifts. Flaskamp, for example, gave Doe a birthday card in May 2000 (on her eighteenth birthday), gave her a card wishing her good luck in a choir concert, gave her a graduation card and gave her a toy gun for her graduation.

During the semester, Flaskamp sent Doe an "inappropriate joke," which apparently was filled with sexual innuendos. Doe's mother happened to see the e-mail and sent Flaskamp a message explaining that the joke was offensive and demanding an apology. Flaskamp apologized to Doe's mother.

At some point during the semester, Flaskamp asked Doe to meet her at a park after school. According to Doe, Flaskamp "wanted to tell me something but she never actually said it that day"; rather, the two "just sat and hung out and talked." JA 503. After this meeting, but before graduation, Flaskamp told Doe "that she was gay. And then she had asked me if I was." JA 506–07. Doe responded "I [do]n't know," *id.*, and the two proceeded to "talk[] about it for a little while," JA 508.

In June 2000, Flaskamp attended Doe's graduation party. That same day, Doe sent Flaskamp a note that included the following: "My heart aches for you and my stomach is in knots. Now I had to declare. The thoughts of my heart in hopes that you'd give me a place in your heart." JA 863. Flaskamp told Doe that she "was in shock that [Doe] felt this way or that she would put it down on paper and feel that deeply." JA 827.

The relationship did not end with Doe's graduation. After Doe enrolled at Eastern Michigan University, she traveled regularly to Fordson High School to visit Flaskamp. The two also continued to communicate by phone, e-mail and instant message.

In December 2000, Doe's mother came to the conclusion that her daughter's relationship with Flaskamp went beyond the "inappropriate joke" e-mail that she had intercepted the prior spring. As a result, she sent an e-mail to Flaskamp warning her to stay away from her daughter and threatening a civil suit if she did not comply. She also told Flaskamp that she planned to inform the school about the relationship, which she believed had started before Doe's graduation.

After reading this e-mail from Doe's mother, Flaskamp contacted Fordson's principal, Paul Smith, to tell him about Doe's mother's concerns. During her conversation with Smith, Flaskamp told him for the

first time about the inappropriate e-mail message she had sent to Doe during the prior spring, explaining that she had mistakenly sent the message to everyone in her e-mail address book. She then told Smith that Doe's mother believed that Flaskamp and Doe had an inappropriate relationship. Denying the allegation, Flaskamp said that she merely had a student-teacher relationship with Doe, an explanation that Smith accepted.

The end of the 2000–2001 school year marked the four-year anniversary of Flaskamp's employment with the school district, and it required the school board to decide whether she would receive tenure. Smith held Flaskamp in high regard as a teacher and recommended her for tenure on March 15, 2001.

That same day, however, Doe's mother called Smith to arrange for a meeting to discuss Flaskamp's relationship with her daughter. When Doe's mother and Smith met four days later, she told Smith that Flaskamp's sexual-innuendo e-mail went directly to her daughter, not to everyone in Flaskamp's e-mail address book. And Doe's mother told Smith that Flaskamp and her daughter frequently communicated by e-mail and instant messages and that Flaskamp had sent as many as 15 greeting cards to Doe. According to Smith, Doe's mother believed that Flaskamp was "chasing after her daughter" and that the relationship developed while Doe was a student. JA 952.

Smith met with Flaskamp later that day, at which point Flaskamp continued to deny having an inappropriate relationship with Doe. Flaskamp later met with her union president, with the school's human resources director and again with Smith. Smith reminded Flaskamp of the serious nature of the allegations and told her to sever any ties with Doe, which Flaskamp agreed to do.

During the following week, Flaskamp had a confrontation with Doe's brother, who still was a student at Fordson. When Flaskamp asked him how Doe was doing, he "exploded" and threatened Flaskamp. Flaskamp reported the incident to Smith, which prompted another meeting with Doe's mother.

At this second meeting in March 2001, Doe's mother insisted that Flaskamp instigated the confrontation with her son by asking him about his sister, and she reiterated her complaint that Flaskamp was pursuing her daughter. She also told Smith of a recent instant-messaging session between Flaskamp and her daughter that contained a number of sexually explicit references. Among other things, Flaskamp and Doe discussed showering together and sharing a bed, and both ended the instant messaging with "xoxo" and "sweet dreams." JA 852. Flaskamp added "love [yo]u very very much." *Id.* Relying on these messages, Smith became convinced that Flaskamp had not been truthful with him about her relationship with Doe, and he accordingly suspended Flaskamp with pay.

At the same time, Smith revised his evaluation of Flaskamp as well as his tenure recommendation. He rated Flaskamp's performance unsatisfactory and recommended that the school board deny her tenure because she had not been truthful about her interactions with Doe. On April 23, 2001, the school board unanimously agreed to deny Flaskamp tenure.

On June 27, 2001, Flaskamp filed a § 1983 action against the Dearborn Public Schools and the individual members of its board for discharging her and for denying her tenure. In her complaint, she claimed that the defendants had violated several of her Fourteenth Amendment rights—her right to intimate association, her right to privacy and her right to be free of arbitrary state action.

The district court granted the defendants' motion for summary judgment. Acknowledging that a right to intimate association exists, the district court held that the right did not extend to Flaskamp's relationship with Doe. The court reasoned "that a relationship between close friends, even one with a sexual component to the relationship, is not the type of relationship that has played a critical role [in] shaping our Nation's culture." *Flaskamp v. Dearborn Pub. Sch.*, 232 F. Supp. 2d 730, 741 (E.D. Mich. 2002). Because the Constitution did not protect Flaskamp's relationship with Doe, the court concluded, Flaskamp's "argument that she was deprived of her right to intimate association fails." *Id.* at 741–42.

Declining to decide whether Flaskamp had suffered a violation of her right to privacy, the court granted qualified immunity to the individual defendants because "the contours of that right were not sufficiently clear to have put Defendants on notice that they violated Plaintiff's right." *Id.* at 738. Flaskamp's failure to identify a municipal policy or custom resulting in a constitutional violation, the court determined, also required judgment in favor of Dearborn Public Schools on this claim. *Id.* at 739.

Lastly, the district court held that the school board made a well-reasoned tenure decision, which included a hearing for Flaskamp and her attorney. The district court found that Smith's recommendation itself was reasonable, and relying heavily on it was "not unusual for the members of the school board." *Id.* at 742. The defendants' actions, the court therefore concluded, did not result in a violation of Flaskamp's right to be free of arbitrary state action. *Id.* at 743.

## II.

We give fresh review to a district court's summary judgment decision, applying the same familiar standard that district courts apply. *Barrett v. Harrington*, 130 F.3d 246, 251 (6th Cir. 1997). While government officials may be subject to § 1983 actions for violating an individual's constitutional right, a plaintiff must overcome the officials' qualified immunity in bringing such an action. To do so, the plaintiff (1) must establish the violation of a constitutional right *and* (2) must show that the right is "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001) (quotations omitted). We must consider the first question, the Supreme Court has instructed, before we consider the second one. *Id.* at 200.

## III.

A case that the parties variously describe as being about the right to intimate association, the right to privacy and the right to be free of arbitrary state action tends to excite the constitutional imagination. And while this case also arises in a relatively unusual fact pattern, it ultimately turns on the application of straightforward and settled Fourteenth Amendment principles. The parties themselves, moreover, have narrowed the scope of inquiry. They both agree that the sexual orientation of the plaintiff in this case makes no difference to the outcome of the dispute. And they both agree that a school district may prevent teachers from having intimate relationships with current students, even students that have reached the age of eighteen.

### A.

The Due Process Clause of the Fourteenth Amendment prevents a "State" from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. "Although a literal reading of the Clause might suggest that it governs only the procedures by which a State may deprive persons of liberty," the Supreme Court has interpreted the Clause "to contain a substantive component as well, one 'barring certain government actions regardless of the fairness of the procedures used to implement them.'" *Planned Parenthood of S.E. Pa. v. Casey*, 505 U.S. 833, 846 (1992) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)).

Over time, the Supreme Court has construed the substantive component of the Due Process Clause to protect two types of "liberty." It incorporates most of the guarantees of the Bill of Rights—which originally restricted only the Federal Government, *see Barron v. Baltimore*, 32 U.S. 243, 247 (1833)—and protects these rights from state infringement. And it protects other "fundamental rights" not expressly mentioned in the Bill of Rights but "implicit in the concept of ordered liberty," *Roe v. Wade*, 410 U.S. 113, 152 (1973), and "deeply rooted in this Nation's history and tradition," *Moore v. City of East Cleveland*, 431 U.S. 494, 503 (1977)—including "personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education," *Lawrence v. Texas*, 539 U.S. 558, 574 (2003) (citing *Casey*, 505 U.S. at 851); *see Loving v. Virginia*, 388 U.S. 1 (1967) (marriage); *Zablocki v. Redhail*, 434 U.S. 374 (1978) (same); *Eisenstadt v. Baird*, 405 U.S. 438 (1972) (contraception); *Griswold v. Connecticut*, 381 U.S. 479

(1965) (same); *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535 (1942) (procreation); *Pierce v. Society of Sisters*, 268 U.S. 510 (1925) (child rearing); *Meyer v. Nebraska*, 262 U.S. 390 (1923) (same).

The Supreme Court has also held that "certain kinds of personal bonds," *Roberts v. United States Jaycees*, 468 U.S. 609, 618 (1984), and "certain [kinds of] intimate conduct," *Lawrence*, 539 U.S. at 562, are protected by the substantive component of the Due Process Clause. Whether called a right to intimate association, *see Roberts*, or a right to privacy, *see Lawrence*, the point is similar: "choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme." *Roberts*, 468 U.S. at 617–18. *See Lawrence*, 539 U.S. at 567 ("When sexuality finds overt expression in intimate conduct with another person, the conduct can be but one element in a personal bond that is more enduring."). The right to intimate association is not limited to familial relationships but includes relationships characterized by "relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." *Roberts*, 468 U.S. at 620; *see also Anderson v. Lavergnem*, 371 F.3d 879, 882 (6th Cir. 2004) (assuming for summary-judgment purposes that a dating relationship between two police officers qualified as an intimate association because the two were monogamous, had lived together and were romantically and sexually involved); *Akers v. McGinnis*, 352 F.3d 1030, 1039–40 (6th Cir. 2003) (determining that some types of personal friendships may constitute intimate associations).

Yet not all government action affecting the right to intimate association receives heightened scrutiny. Only government action that has a "direct and substantial influence" on intimate association receives heightened review. *Anderson*, 371 F.3d at 882. Government action has a "direct and substantial influence" on intimate association "only where a large portion of those affected by the rule are absolutely or largely prevented from [forming intimate associations], or where those affected by the rule are absolutely or largely prevented from [forming intimate associations] with a large portion of the otherwise eligible population of [people with whom they could form intimate associations]." *Id.* (brackets in original). *See Vaughn v. Lawrenceberg*, 269 F.3d 703, 710 (6th Cir. 2001) ("direct and substantial" interference results "only where a large portion of those affected by the rule are absolutely or largely prevented from marrying, or where those affected by the rule are absolutely or largely prevented from marrying a large portion of the otherwise eligible population of spouses"). Lesser intrusions—those that are not direct and substantial—receive rational-basis review. *See Montgomery v. Carr*, 101 F.3d 1117, 1124 (6th Cir. 1996).

Prior applications of this rule by the Supreme Court and this court help to illustrate its contours. In *Califano v. Jobst*, 434 U.S. 47 (1977), the Court held that a social security provision that terminated certain benefits when a recipient married someone ineligible for benefits did not directly and substantially burden a recipient's freedom to choose whom to marry and thus required the government to show only a reasonable governmental objective. *See also Lyng v. Castillo*, 477 U.S. 635 (1986) (upholding a law providing fewer food-stamp benefits to nuclear families than to non-related or extended families living together).

In *Montgomery*, this court held that an anti-nepotism rule barring employees of the same school from marrying did not constitute a direct and substantial burden on the right to marry. "[M]erely placing a non-oppressive burden on the decision to marry, or on those who are already married," the court held, "is not sufficient to trigger heightened constitutional scrutiny," because anti-nepotism rules "are not 'direct' in the sense that they place an absolute barrier in the path of those who wish to marry." *Id.* at 1125. *See also Vaughn*, 269 F.3d at 711 (terminating a municipal employee for marrying another municipal employee is not a "direct and substantial" interference with the right to intimate association); *Wright v. Metrohealth Med. Ctr.*, 58 F.3d 1130 (6th Cir. 1995) (holding that an anti-nepotism policy does not directly and substantially interfere with the right to intimate association).

The same rule has been applied to relationships less formal than marriage. *See Anderson*, 371 F.3d at 882 (holding that a police force policy prohibiting dating between officers of different ranks did not directly and substantially burden the right to intimate association because officers were still free to date

anyone other than this small subset of the population); *Akers*, 352 F.3d at 1041 (holding that a Michigan Department of Corrections rule prohibiting workers from having non-work-related contact with prisoners, parolees, probationers and their relatives and visitors did not directly and substantially burden the right to intimate association); *Marcum v. McWhorter*, 308 F.3d 635 (6th Cir. 2002) (holding that police department could terminate a police officer for having an adulterous affair).

Applying these principles here, we need not decide whether Flaskamp's relationship with Doe—whether before Doe graduated from high school or in the nine months after graduation—constituted the kind of intimate association protected by the Fourteenth Amendment. It suffices here that the board's action did not "directly and substantially" affect Flaskamp's right of intimate association and that the board did not act in an unreasonable manner in addressing the issue.

Even if we were to treat the board's action as amounting to a ban on relationships between teachers and their students for, say, one year after graduation, teachers would still be able to date a wide range of adults of a wide range of ages. *Cf. Akers*, 352 F.3d at 1040–41. In this respect, the restriction is not unlike the one in *Anderson*, where we held that a police policy prohibiting dating between officers of different ranks was not a direct and substantial burden on the right to intimate association because officers were still free to date anyone other than this relatively small subset of the population. 371 F.3d at 882. The same is true here; rational-basis review applies.

Rational-basis review, the Supreme Court has held, is satisfied "so long as there is a plausible policy reason" for the decision, *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992), and it is "entirely irrelevant for constitutional purposes" whether the plausible reason in fact motivated the decisionmaker, *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 315 (1993). Several rational explanations support the board's decision.

First, Principal Smith's assessment of Flaskamp's truthfulness—his conclusion that she had not been candid in responding to his questions about the issue—alone provided a legitimate explanation for the board's decision to deny Flaskamp tenure. *Cf. Beilan v. Bd. of Pub. Ed.*, 357 U.S. 399, 405 (1958) ("By engaging in teaching in the public schools, petitioner did not give up his right to freedom of belief, speech or association. *He did, however, undertake obligations of frankness, candor and cooperation* in answering inquiries made of him by his employing Board examining into his fitness to serve it as a public school teacher.") (emphasis added). In view of the school board's policy preventing teachers from dating students and in view of Doe's mother's allegations, it was appropriate for the principal to ask Flaskamp the questions that prompted this lack of candor, whether those questions went to the nature of the relationship before graduation or to the nature of the relationship in the months after graduation. *Cf. Shelton v. Tucker*, 364 U.S. 479, 485 (1960) ("There can be no doubt of the right of a State to investigate the competence and fitness of those whom it hires to teach in its schools.").

Second, on the basis of Flaskamp's answers to these questions as well as other evidence that Flaskamp and Doe had engaged in a sexual relationship after graduation, the board rationally could conclude that the romantic relationship started before graduation. The type of intimate association for which Flaskamp seeks constitutional protection does not generally spring into existence at one point in time; it develops over a period of time. A school board thus legitimately could be concerned that a romantic relationship between a teacher and former student soon after graduation provides circumstantial evidence that the same relationship existed before graduation. As Flaskamp acknowledges, "[t]he four Board of Education members who specifically remember the reason for their vote recall that they were convinced that Plaintiff had had an improper relationship with [Doe] when she was a student. They believed this was so because of her present relationship." Appellant Br. at 38–39.

Third, in view of the importance of prohibiting teachers and students from beginning romantic relationships, a school board could act prophylactically in this area by prohibiting sexual relationships between teachers and former students within a year or two of graduation. Such a policy would prevent high school seniors from being perceived as prospects eligible for dating immediately after graduation; it would

prevent interference with the education of other family members who still may be in school (as happened with Doe's brother); and it would curb sexual harassment liability arising from claims that a policy against student-teacher relationships is not adequately enforced, *see Kinman v. Omaha Pub. Sch. Dist.*, 171 F.3d 607 (8th Cir. 1999); *Doe v. Bd. of Educ.*, 18 F. Supp. 2d 954 (N.D. Ill. 1998). While the school board here did not have such a policy, its legitimacy bolsters the reasonableness of the school board's decision in this case to be skeptical of Flaskamp's claim that her romantic relationship with Doe did not start until after Doe had graduated.

## B.

Flaskamp next argues that the board's action violated another right protected by the Due Process Clause—her right to privacy. We disagree.

The Supreme Court has recognized two privacy rights: an autonomy-based right to privacy and a right to control the dissemination of sensitive information about one's self. *See Whalen v. Roe*, 429 U.S. 589, 599–600 (1977); *Bloch v. Ribar*, 156 F.3d 673, 683 (6th Cir. 1998). The first principle protects an individual's freedom in making certain highly personal choices about one's relationships and family, *id*., which in this instance is materially akin to the right to intimate association, *see Marcum*, 308 F.3d at 641; *Fleisher v. Signal Hill*, 829 F.2d 1491, 1500 (9th Cir. 1987) ("[T]he freedom of intimate association is coextensive with the right of privacy; both the freedom of intimate association and the right of privacy describe that body of rights that protect[s] intimate human relationships from unwarranted intrusion or interference by the state."). Because the board's actions did not directly and substantially impact Flaskamp's ability to engage in intimate relationships, as we have already shown, and because Flaskamp has offered no explanation how this right to privacy differs from the right to intimate association, we need not independently address this claim. *See Kallstrom v. Columbus*, 136 F.3d 1055, 1061 (6th Cir. 1998) (holding that release of information established a cognizable right-to-informational-privacy claim but did not raise a claim under the autonomy principle because it did not "seriously infringe upon the intimate decisionmaking incidental to protection of the family").

The second principle protects an individual's "informational right to privacy," *Bloch*, 156 F.3d at 683, the right to prevent sensitive information from becoming public, *Whalen*, 429 U.S. at 600; *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 457 (1977). In *Whalen*, the Supreme Court upheld a New York statute requiring physicians to compile prescription records with patient information for a state-run database. The Court found little possibility that the information would be widely disseminated and little risk that the dissemination of the information would deter patients from seeking the prescriptions at issue. *Id*. at 600–03. In *Nixon*, Congress enacted a law that required the screening of the former president's archives in preparation for their use in judicial proceedings and for their eventual public access. *Id.* at 433–34. Under the law, archivists were asked to identify President Nixon's personal and private documents, then to return these documents to him. *Id*. The Court held that the screening did not violate President Nixon's right to privacy because it amounted to a limited intrusion, the intrusion was performed by archivists who were in the habit of being discreet, President Nixon was a public figure, he had no expectation of privacy in most of the documents and the screening was necessary to identify which documents should be returned to him. *Id*. at 465. In neither of these two cases, it bears adding, did the Court uphold the claimant's constitutional claim.

This court has narrowly construed *Whalen* and *Nixon* to "extend the right to informational privacy only to interests that implicate a fundamental liberty interest." *Bloch*, 156 F.3d at 684. In assessing these claims, we apply a two-part test: "(1) the interest at stake must implicate either a fundamental right or one implicit in the concept of ordered liberty; and (2) the government's interest in disseminating the information must be balanced against the individual's interest in keeping the information private." *Id*.

In *Bloch*, we held that "a rape victim has a fundamental right of privacy in preventing government officials from gratuitously and unnecessarily releasing the intimate details of [a] rape where no penological

purpose is being served." *Id*. at 686. On balance, we concluded, the plaintiff established a cognizable constitutional claim because the defendant sheriff had released details of the rape at a press conference and there was no law-enforcement purpose served by the dissemination of the information. *Id*.

In *Kallstrom*, police released an officer's personnel files to an attorney working for several criminal defendants. The court found a fundamental liberty interest in "preserving [the officers'] lives and the lives of [ ] their family members, as well as preserving their personal security and bodily integrity," 136 F.3d at 1062, an interest that rose to "constitutional dimensions" given the risks of releasing the information to individuals potentially seeking revenge in the aftermath of their prosecution. *Id*. at 1064. Releasing the information to the criminal defendants' attorney, we held, did not further the government's interest in informing citizens about the workings of law enforcement. *Id*. at 1065.

In *Hughes v. North Olmstead*, 93 F.3d 238 (6th Cir. 1996), the disclosure stemmed from a police force investigation of an officer charged with sexual misconduct. *Id*. at 240. At issue was a question by the investigator to the officer's wife, also an officer on the force, about whether their marriage was an exclusive relationship. *Id*. at 240–41. Such questioning, we held, did not violate a clearly established constitutional right because it was related to an assessment of job performance. *Id*. at 242.

Relying on these cases in general and on *Bloch v. Ribar* in particular, Flaskamp argues that Smith's questioning about her post-graduation relationship with Doe impermissibly pried into her personal life. We disagree. As with Flaskamp's intimate-association claim, we need not address whether her claim implicates a fundamental right. Here, it suffices that Smith and the board did not publicly disseminate the information and had ample reasons for these inquiries.

Any intrusion into Flaskamp's informational privacy, as an initial matter, was relatively minor because the disclosure itself was quite limited. *Compare In re Zuniga*, 714 F.2d 632, 642 (6th Cir. 1983) (rejecting claim arising from disclosure to grand jury because the "information will be disclosed only to the minimal extent necessary to promote a proper governmental interest and will not be subject to widespread dissemination"), *with Bloch*, 156 F.3d at 686 (finding cognizable claim where information was disseminated at a press conference). Until this lawsuit was filed, the results of Smith's investigation were not disseminated publicly and (so far as the record shows) were shared only with the board members asked to vote on Flaskamp's future employment.

Just as we have treated the extent of dissemination as an important factor in assessing an informational-privacy claim, so also we have considered the explanation the government body has given for seeking the information in the first instance in assessing an informational-privacy claim, *see Hughes*, 93 F.3d at 240–41. In this instance, the board's interests in enforcing its prohibition against teachers dating students justified this limited inquiry into Flaskamp's relationship with Doe. *See, id*. at 242 (upholding inquiry into status of marital relationship where officer-husband was under investigation for sexual misconduct). Flaskamp concedes that it was appropriate to ask about the status of the relationship before Doe graduated. And while Flaskamp protests any inquiries about the status of the relationship after Doe had graduated, she never disclosed any information about the relationship at that point. Instead, the school principal (Smith) learned about the nature of the relationship from Doe's mother and apparently believed he learned something about the relationship through Flaskamp's lack of candor in responding to whether Flaskamp and Doe still were involved with each other. Under these circumstances, Flaskamp's privacy claim reduces to the complaint that Smith had no right to ask her about the current status of her relationship with Doe. But because information about a current relationship may well cast light on the nature of the relationship nine months earlier, the question was a legitimate one. In the final analysis, the limited dissemination of the information about Flaskamp's relationship and the legitimacy of Smith's questions about the relationship establish that Flaskamp's informational-privacy rights were not violated.

## C.

Flaskamp, lastly, argues that the board's action violated still another component of substantive due process protected by the Fourteenth Amendment—the right not to be subject to irrational and arbitrary state action. Pet'r Br. at 40; *see Kelly v. Johnson*, 425 U.S. 238, 248 (1976). In view of our earlier conclusions, it should be plain that the board did not infringe this modest constitutional requirement in suspending Flaskamp with pay and in denying her application for tenure.

## IV.

For these reasons, we affirm.