BOGGS, C. J., delivered the opinion of the court, in which SUHRHEINRICH, J., joined. CLAY, J. (pp. 1044-1056), delivered a separate opinion concurring in part and dissenting in part.
OPINION
BOGGS, Chief Judge.
Plaintiffs, Dawn Akers and Kim Loran-ger, a current and a former employee of the Michigan Department of Corrections (“MDOC”), and their union, the United Automobile, Aerospace, and Agricultural Implement Workers of America, Local 6000 (“UAW”), appeal the district court’s summary judgment for the defendants, Kenneth McGinnis, the director of the MDOC, and numerous other listed MDOC administrators. The plaintiffs had sued on the grounds that an MDOC rule (“Rule”) that barred all MDOC employees from any non-work-related contact with prisoners, parolees, probationers (“offenders”), their relatives and visitors, violated their “clearly established rights to privacy, association, and due process guaranteed by the First, Third, Fourth, Fifth, Ninth, and Fourteenth Amendment to the United States Constitution.” Specifically, the plaintiffs sought reinstatement after discharge for violating the Rule, expungement from the plaintiffs’ disciplinary records of any reference to a violation of the Rule, and compensatory and punitive damages. On cross-motions for summary judgment, the district court held that the Rule was constitutional and that the defendants enjoyed qualified immunity. Plaintiffs now appeal the holdings that the Rule was not contrary to the freedom of association guaranteed by the First and Fourteenth Amendments and that the defendants enjoyed qualified immunity. We affirm.
I
At all times relevant to this litigation, the- MDOC has had a Rule barring em *1034 ployees from “Improper Relationships with Prisoners, Parolees or Probationers, Visitors or Families.” This Rule, originally known as Rule 12, strictly prohibited “improper or overly familiar conduct with [offenders] or their family members or visitors.” Violations of the Rule “subject[ed] an employee to disciplinary action up to and including dismissal ].” A non-exhaustive list of improper actions included “exchange of letters, money or items, ... cohabitation [except in case of a preexisting marriage], being at the home of [an offender] for reasons other- than an official visit without reporting the visit, ... giving [offender] [employee’s] home telephone number, [and] sexual contact of any nature.” (emphasis in original). Furthermore, the Rule required reporting of “[a]ny contact made with [an offender], or their family member(s), outside the regular performance of an employee’s job.” In June 1996, Rule 12 was repromulgated as Rule 24. In September 1999, during the course of this litigation, Rule 24 was replaced by a substantially identical Rule 46. Finally, in April 2000, Rule 46 was revised to clarify the definitions of family member and visitor and recognize the power of the MDOC to grant individual employees limited exemptions to the Rule. To receive such an exemption allowing contact with offenders’ visitors or family members, but not offenders themselves, an employee would have to submit a misleadingly titled “Offender Contact Exception Request” form and await approval from the Director of the MDOC or a designee. From the creation of the exception procedure to July 23, 2001, 226 such exceptions had been sought and of these 223 had been granted.
Plaintiff Loranger, then a Wayne County probation officer, was contacted by a man she had dated before becoming an MDOC employee and who was then serving a life sentence without parole in a prison outside her jurisdiction. She exchanged several letters with him. When Loranger realized that she was in violation of the Rule, she approached her supervisor about the matter. Four months later, she was terminated for her Rule violation. Plaintiff Akers, while a bookkeeper at a correctional facility in Chippewa County, had befriended a prisoner clerk. Shortly after the prisoner’s release, Akers gave him a ride in her car to a job interview. For this violation of the Rule, she also was terminated by the MDOC. Both women had previously been positively evaluated by their supervisors and in neither case is there an allegation that their specific conduct had adversely affected the MDOC’s function. Plaintiff UAW represents about two thousand clerical and professional employees of the MDOC, among them Loran-ger and Akers. UAW does not represent any prison guards.
In March 1997, the plaintiffs filed a complaint in the. United States District Court for the Western District of Michigan and the case was assigned to a magistrate judge. During the following months, labor arbitrators set aside the discharges of both Loranger and Akers and instead imposed relatively brief suspensions on both women. As the plaintiffs had also sought the purging of their disciplinary record of any reference to the Rule violation as well as monetary damages, their reinstatement did not moot the action. After her reinstatement and during the pendency of the case, Loranger repeatedly sought permission to have contact with Rebecca Contreras, a long-standing friend whose son had been placed on probation, and was repeatedly denied. When Loranger became pregnant and wished Contreras to be her child’s godmother, she sought and was granted a preliminary injunction ordering the MDOC to allow Loranger to invite Contreras to her child’s baptism. Loran-ger also continued to request permission to have contact with Stacey Artley, a young woman to whom Loranger was a “Big *1035 Sister” and who then was on probation. Akers, during the pendency of this action, transferred to a position with the Michigan Department of Natural Resources, mooting her claims for prospective relief. On cross-motions for summary judgement, the magistrate judge issued a report and recommendation, which proposed finding the original Rule to be unconstitutional under the First and Fourteenth Amendments, expunging Akers’s and Loranger’s disciplinary record, and declaring moot the challenge to the current version of the Rule. However, the district court rejected the report and recommendation and found that there was a live controversy regarding both the current and the old version of the Rule, but also that all versions of the Rule were constitutional, and therefore granted summary judgement to MDOC and qualified immunity to the individual named defendants. Here the plaintiffs appeal this grant of summary judgment and qualified immunity.
II
The MDOC contends that any challenges to the previous versions of the Rule were mooted when it adopted its current version. However, a “defendant’s voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case.” Jones v. City of Lakeland, 224 F.3d 518, 529 (6th Cir.2000) (en banc) (quoting Friends of the Earth v. Laidlaw Envtl. Servs., 528 U.S. 167, 174, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)). “A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.” Jones, 224 F.3d at 529 (quoting United States v. Concentrated Phosphate Export Ass’n, 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968)). “The ‘heavy burden of persua[ding]’ the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness.” Jones, 224 F.3d at 529 (quoting Laidlaw, 528 U.S. at 170, 120 S.Ct. 693). In the present case, as the promulgation of work rules appears to be solely within the discretion of the MDOC, there is no guarantee that MDOC will not change back to its older, stricter Rule as soon as this action terminates. Moreover, as the plaintiffs could be entitled to money damages and the purging of their disciplinary records if the old version of the Rule were found to be unconstitutional even if the current version was constitutional, the issue is not moot and it is incumbent on this court to examine all versions of the Rule. We begin by analyzing the original version of the Rule without the exception procedure.
The plaintiffs claims of constitutional violation are based upon two analytically distinct forms of freedom of association: freedom of intimate association, protected under the Substantive Due Process component of the Fourteenth Amendment, and freedom of expressive association, protected under the Freedom of Speech Clause of the First Amendment. See Roberts v. United States Jaycees, 468 U.S. 609, 617-18, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). With respect to intimate association, “the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty.” Ibid. With respect to expressive association, “the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment — speech, assembly, petition for the redress of grievances, and the exercise of religion. The Constitution guarantees freedom of association of this kind as an indispensable means of preserving *1036 other individual liberties.” Id. at 618, 104 S.Ct. 3244. As “the nature and degree of constitutional protection afforded freedom of association may vary depending on the extent to which one or the other aspect of the constitutionally protected liberty is at stake in a given case,” it is necessary to examine the Rule as a potential infringement of both intimate association and expressive association. Ibid.
A
State employees’ freedom of expressive association claims are analyzed under the same standard as state employees’ freedom of speech claims. See Boals v. Gray, 775 F.2d 686, 692 (6th Cir.1985). “Because the analytic tools for adjudicating First Amendment retaliation claims under the Free Speech Clause have been so extensively developed, courts in this and other circuits have tended to import fully that reasoning when litigants have characterized their claims as arising under another First Amendment clause.” Thaddeus-X v. Blatter, 175 F.3d 378, 390 (6th Cir.1999) (en banc). The contours of state employees’ freedom of speech in turn are defined by two leading Supreme Court precedents.
In Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the Supreme Court denied that government employees “may constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the [institution] in which they work.” Id. at 568, 88 S.Ct. 1731. But while the Court has long rejected Holmes’s famous dictum on the free speech right of government employees,[1] it also concluded “that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.” Ibid.
In Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), the Court further amplified on this issue.
When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment. Perhaps the government employer’s dismissal of the worker may not be fair, but ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable.
Id. at 146, 103 S.Ct. 1684. In general, and outside the area of issues of public concern, the First Amendment provides no greater protection against discipline or discharge to government employees than it does to private employees:
[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency *1037 allegedly in reaction to the employee’s behavior.... Our responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government; this does not require a grant of immunity for employee grievances not afforded by the First Amendment to those who do not work for the state.
Id. at 147, 103 S.Ct. 1684. Moreover, the Court cautioned against an overly broad construction of the ambit of the public concern:
To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark — and certainly every criticism directed at a public official — would plant the seed of a constitutional case. While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.
Id. at 149, 103 S.Ct. 1684.
In Pickering and Connick, the Supreme Court created a test containing two levels of scrutiny.[2] Restraints on government employee speech, or, as in the present case, government employee association, touching on a matter of public concern must meet the Pickering test balancing between the interests of the employee and the interests of the state. We have characterized this test as a “form of intermediate scrutiny.” Montgomery v. Carr, 101 F.3d 1117, 1129 n. 7 (6th Cir.1996). Restraints on government employee speech, or government employee association, not touching on a matter of public concern, are subject merely to rational basis scrutiny. In either case, it is the court’s task to apply the test to the facts. See Waters v. Churchill, 511 U.S. 661, 671, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994). This bifurcated test remains the law. The Supreme Court’s most recent extensive disquisition on this subject, while providing further instruction on the proper balancing of governmental interests and the interest of government employees to speak on matters of public concern, adopts without further elaboration the Pickering/Connick distinction between matters that are of public concern and those which are not. United States v. Nat’l Treasury Employees Union, 513 U.S. 454, 465-66, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995).
The question of what speech or association touches on a matter of public concern is by necessity a question for case-by-case adjudication. See Dambrot v. Cent. Mich. Univ., 55 F.3d 1177, 1186 n. 8 (6th Cir.1995) (collecting Sixth Circuit precedent concerning what speech is a matter of public concern).
In general, a matter of public concern is a matter of political, social, or other concern to the community. It is important, however, to distinguish matters of public concern from internal office politics. Federal courts normally do not review personnel decisions reacting to an employee’s behavior when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters of only per *1038 sonal interest. The mere fact that public monies and government efficiency are related to the subject of a public employee’s speech does not, by itself, qualify that speech as being addressed to a matter of public concern. If the speech is not related to a matter of public concern, we do not evaluate the reasons for the decision.
Jackson v. Leighton, 168 F.3d 903, 909-10 (6th Cir.1999) (internal citations, alterations, and quotation marks omitted). “To determine whether the speech involves a matter of public concern, we look to the content, form, and context of the statements in light of the record as a whole.” Id. at 910. “Furthermore, the court must determine the point of the speech in question ... because controversial parts of speech advancing only private interests do not necessarily invoke First Amendment protection.” Hardy v. Jefferson Cmty. Coll., 260 F.3d 671, 678 (6th Cir.2001) (internal quotation marks, alterations, and citations omitted). The Supreme Court has indicated that the “question of whether expression is of a kind that is of legitimate concern to the public is also the standard in determining whether a common-law action for invasion of privacy is present.” Connick, 461 U.S. at 143 n. 5, 103 S.Ct. 1684. Few indicia of speech are dispositive. “[A]n employee’s speech, activity or association, merely because it is union-related, does not touch on a matter of public concern as a matter of law.” Boats, 775 F.2d at 693. Nor are statements made privately necessarily outside the reach of the public concern rule. Givhan v. W. Line Consol. Sch. Dist., 439 U.S. 410, 414, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979). However, government employees’ speeches and articles that “ha[d] nothing to do with their jobs and [did] not even arguably have any adverse impact on the efficiency of the offices in which they work,” but were made to public audiences are deemed to touch on matters of public concern. Nat’l Treasury Employees Union, 513 U.S. at 465-66, 115 S.Ct. 1003.
Almost all conceivable association affected by the Rule and all association alleged to have been discouraged by the Rule do not touch on matters of public concern. Loranger wishes to have contacts with an old friend and her “Little Sister.” Akers wishes to assist a probationer whom she befriended. While all of these impulses are entirely understandable, even laudable, they are purely private matters of little or no concern to the community as a whole. The plaintiffs also envision hypothetical situations in which they are prevented from contacting a union official who is also related to an offender. But even such hypothetical situations do not rise to the level of public concern because mere individual labor grievances are not matters of public concern. See, e.g., Connick, 461 U.S. at 154, 103 S.Ct. 1684; Boals, 775 F.2d at 693.
Plaintiffs come closest to alleging interference with an association touching on the public concern when asserting their right to contact a political party official who was also the uncle of an offender. If such association is made for a purpose such as campaigning for public office, it would arguably touch on a matter of public concern. However, a separate line of cases has upheld against constitutional challenge governmental restrictions on public employees’ partisan political activities:
Congress had, and has, the power to prevent [government employees] from holding a party office, working at the polls, and acting as party paymaster for other party workers. An Act of Congress going no farther would in our view unquestionably be valid. So would it be if, in plain and understandable language, the statute forbade activities such as organizing a political party or club; actively participating in fund-raising activi *1039 ties for a partisan candidate or political party; becoming a partisan candidate for, or campaigning for, an elective public office; actively managing the campaign of a partisan candidate for public office; initiating or circulating a partisan nominating petition or soliciting votes for a partisan candidate for public office; or serving as a delegate, alternate or proxy to a political party convention. Our judgment is that neither the First Amendment nor any other provision of the Constitution invalidates a law barring this kind of partisan political conduct by federal employees.
United States Civil Serv. Comm’n v. Nat’l Ass’n of Letter Carriers, 413 U.S. 548, 556, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); see also Carver v. Dennis, 104 F.3d 847, 853 (6th Cir.1997) (finding no violation of associational or free speech rights when county clerk terminated subordinate who decided to run for the same office). Thus, the actual associations denied to the plaintiffs, as well as hypothetical associations suggested in the plaintiffs’ briefs, either do not touch on a matter of public concern, or may be otherwise restrained.
The MDOC easily meets the rational basis test for the non-public association restrained by the Rule.[3] The MDOC has a legitimate interest in preventing fraternization between its employees and offenders and their families. Given the proven willingness of offenders to break the law, often violently, to reach their ends, on the one hand, and the near-plenary power over offenders entrusted to MDOC employees, on the other, the potential for exploitation of vulnerable offenders by MDOC employees, or vulnerable MDOC employees by offenders, needs no elaboration. The MDOC’s interest in preventing such exploitation is only somewhat attenuated in cases where the employee has no direct supervisory authority over the offender. Even clerical workers without any penal authority can by the mere manipulation of paperwork greatly affect an offender’s status for better or worse, or at least be pressured into attempting to do so. The inclusion of offenders’ visitors and families into the class with whom contact is forbidden may be necessary to prevent the use of third parties to circumvent the ban on direct contact and influence. The MDOC’s interest is clearly legitimate, and the Rule is a rational means for advancing the interest. Therefore, the Rule withstands challenge on the basis of freedom of expressive association.[4]
B
The plaintiffs also claim that the Rule interfered with their personal friendships. Personal friendship is pro *1040 tected as an intimate association. Corrigan v. City of Newaygo, 55 F.3d 1211, 1214-15 (6th Cir.1995). This court explicated the appropriate level of scrutiny for restraints on the freedom of intimate association in Montgomery.[5] In that case, we considered a challenge, as contrary the freedom of intimate association, to a school district’s rule that barred employees at the same school from marrying. 101 F.3d at 1117-21. We held that a “direct and substantial interference” with intimate association was subject, to strict scrutiny, while lesser interferences merely merited rational-basis review. Id. at 1124 (citing Zablocki v. Redhail, 434 U.S. 374, 383-84, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978)).
The contours of a direct and substantial interference with intimate association are illustrated by the case law. A total ban on marriage outside one’s ethnic group is a direct and substantial interference. Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). So is a requirement on non-custodial parents to obtain court permission before any remarriage. Zablocki, 434 U.S. at 387, 98- S.Ct. 673. However, termination of Social Security benefits for a disabled dependent child who marries someone ineligible for benefits is not. Califano v. Jobst, 434 U.S. 47, 58, 98 S.Ct. 95, 54 L.Ed.2d 228 (1977). Nor is a Department of Agriculture regulation that treats husband and wife as one person for purposes of calculating farm subsidies, Women Involved in Farm Econs. v. United States Dep’t of Agric., 876 F.2d 994, 1004 (D.C.Cir.1989), the Internal Revenue Code’s marriage penalty, Druker v. Comm’r, 697 F.2d 46, 50 (2d Cir.1982), requiring a citizen-alien couple to fill out a form and submit to an INS interview, Aguila-Cisneros v. I.N.S., 5 Fed.Appx. 415, 2001 WL 223969, at *2 (6th Cir. Feb.27, 2001), or termination from employment of a municipal employee who marries another municipal employee, Vaughn v. Lawrenceburg Power Sys., 269 F.3d 703 (6th Cir.2001). From this line of cases, we have abstracted a general rule that we will find “direct and substantial burdens only where a large portion of those affected by the rule are absolutely or largely prevented from marrying, or where those affected by the rule are absolutely or largely prevented from marrying a large portion of the otherwise eligible population of spouses.” Vaughn, 269 F.3d at 710 (6th Cir.2001) (citing Montgomery, 101 F.3d at 1124-25).
Under these precedents, the Rule is subject only to rational basis review, which — as we explained already — it passes. It does not prevent a large portion of MDOC employees from forming intimate associations; all MDOC employees continue to enjoy the ability to form intimate associations — just not with offenders. Nor are those affected by the Rule absolutely or largely prevented from forming intimate associations with a large portion of the otherwise eligible population. While the plaintiffs stress the large offender population in Michigan, it is only a little over 1% of the state’s population. Even if the number of visitors and family members should exceed the number of offenders ten-fold, surely a generous estimate, MDOC employees would only be barred from intimate association with about 10% of the state’s population (whereof 9% are subject to routinely-granted exemption under the current Rule). This is *1041 far from the absolute bar against marrying a majority of the jurisdiction’s population said in Loving to be a direct and substantial interference. Moreover, while the bar in Loving was absolute, the simple expedient of transferring to another part of the state government or taking employment in the private sector is available to MDOC employees here. In fact, one of the named plaintiffs in this case undertook that step. While a transfer is undoubtedly an inconvenience, it was not found to be a direct and substantial interference in Montgomery, nor was even a more serious employment consequence, termination, found to be such an interference in Vaughn.
Amicus curiae American Civil Liberties Union argues that the Rule violates the constitutionally protected freedom of association, not merely of MDOC employees, but also of those not employed by the MDOC, such as family members and visitors of offenders, who would associate with employees but for the Rule. Initially, we recognize that First Amendment “protection afforded is to the communication, to its source and to its recipients both.” Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, 425 U.S. 748, 756, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). To the extent amicus suggests that the Rule should therefore be judged not by the relatively lenient standard for the government-as-employer’s interference with private association, but by the more rigorous standard for the government-as-sovereign’s interference with private association, it flies in the face of the Supreme Court’s and this court’s precedent. Any association by definition involves two or more parties and restraining one party from associating will by necessity result in a concomitant effect on the other parties. In this regard, the association between MDOC employees and offenders, their family members, and visitors is no different than almost all other restrictions on association by government employees. Nothing in our precedents indicates that the government only has enhanced authority to regulate association between governmental employees or others over whom it has enhanced authority. To the contrary, to hold as amicus suggest would eviscerate the rule that “Congress may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large.” Nat’l Treasury Employees Union, 513 U.S. at 465, 115 S.Ct. 1003. Virginia State Board is not to the contrary because “[f]reedom of speech presupposes a willing speaker” and the constitutional protections only become effective “where [such] a speaker exists.” 425 U.S. at 756, 96 S.Ct. 1817. Here, the government merely conditions employment on an employee’s agreement not to become a willing speaker to or associate with a limited class of persons. The standard of review of such restrictions on employees is the one of Pickering, Connick, and their progeny.
As there is no dispute that the revised Rule is more lenient than the original Rule, which we upheld above, there is no need to decide whether the Rule is saved by the exemption procedure grafted onto it. If the older Rule is constitutional, a fortiori so is the revised Rule. The plaintiffs object to the exemption procedure on the grounds that exemptions are granted purely at the standardless discretion of the MDOC. As we agree with the court below that the Rule was constitutional even in the absence of an exemption procedure, we need not address this issue. However, we note that even were we to conclude that the exemption procedure was necessary to sustain the Rule, this argument would not avail plaintiffs. A discretionary exemption procedure can doom a statute subject to enhanced review under the First Amendment. See, e.g., Forsyth County v. Nationalist Movement, 505 U.S. 123, 130-31, *1042 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) (striking down county ordinance giving discretion to administrator in awarding of parade permits); City of Lakewood v. Plain Dealer Pub. Co., 486 U.S. 750, 757, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) (striking down city ordinance granting mayor unbridled discretion to permit or prohibit distribution of private newspapers at public news racks); Sec’y of State of Md. v. Joseph H. Munson Co., 467 U.S. 947, 962 n. 12, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984) (striking down statute granting discretion to secretary of state to waive limits on charitable fund-raising expenses); Shuttlesworth v. City of Birmingham, 394 U.S. 147, 150-51, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) (striking down city ordinance granting broad discretion to commission to grant or deny parade permits). Here, however, we subject a regulation to rational-basis review. A discretionary exemption procedure unable to meet the higher standard of review can still meet this highly-deferential one.
Because the Rule is constitutional, the individual defendants enjoyed qualified immunity. “In civil suits for money damages, government officials are entitled to qualified immunity for discretionary acts that do ‘not violate clearly established [federal] statutory or constitutional rights of which a reasonable person would have known.’ ” Goad v. Mitchell, 297 F.3d 497, 501 (6th Cir.2002) (quoting Anderson v. Creighton, 483 U.S. 635, 638-39, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), and Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). “To determine if qualified immunity attaches, the Supreme Court has delineated a two-part, sequential analysis.” Goad, 297 F.3d at 501 (citing Saucier v. Katz, 533 U.S. 194, 200-01, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). “First, we inquire whether, ‘[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer’s conduct violated a constitutional right?’ ” Goad, 297 F.3d at 501 (quoting Saucier, 533 U.S. at 201, 121 S.Ct. 2151). “If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.” Saucier, 533 U.S. at 201, 121 S.Ct. 2151. Having found no constitutional violation, we must answer the qualified immunity question in the affirmative.
While this disposes of this question, we note that for a plaintiff to defeat a defense of qualified immunity, he must not only prove the violation of a right, but of a clearly established right. Harlow, 457 U.S. at 818, 102 S.Ct. 2727. Indeed, the right must be “so clearly established when the acts were committed that any officer in the defendant’s position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct.” Dominque v. Telb, 831 F.2d 673, 676 (6th Cir.1987) (emphasis added). See also McCloud v. Testa, 97 F.3d 1536, 1542 (6th Cir.1996) (holding that “individual capacity defendants in § 1983 cases receive some benefit from legal doubt about the clarity of existing law.”). However, in the present case the district judge found no violation of a constitutional right at all. Thus, for the plaintiffs to prevail here on the question of qualified immunity, the situation would have to be such that any MDOC official when promulgating the Rule would be aware of the fact that it violated the Constitution, but a United States district judge, given the benefit of decades of legal training and practice, years of hearings and adversarial briefings by able counsel, was unable to find such a violation. While such a situation is not logically impossible, and doubtless has occurred from time to time, it certainly must be a very rare one, implicitly casting some doubt on the minimum competency of such a trial judge. Therefore, in cases such as *1043 this, unless counsel are prepared to contend that such an extreme and unusual situation occurred, they will not be able to succeed in reversing a grant of qualified immunity.
C
The separate opinion concurring in part and dissenting in part, in contrast to this opinion, the trial court opinions, and all party and amici briefs, analyzes the Rule under the framework of Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Under Turner, “a prison regulation imping[ing] on inmates’ constitutional rights” will be upheld “if it is reasonably related to legitimate penological interests.” Id. at 89, 107 S.Ct. 2254 (emphases added).
Under the First and Fourteenth Amendments, associational rights of the general population enjoy the highest level of legal protection against state regulation. However, the state enjoys enhanced powers to regulate association by certain groups. Two such regulable groups are involved here: prisoners, under Turner and its progeny, and state employees, under Pickering and its progeny. Moreover, the exercise of associational rights by definition involves more than one party and to regulate one party to an association impinges upon the interests of the other parties. Therefore, the enhanced regulatory power over some groups implies by necessity a power to impinge upon the interests of those who would associate with members of the regulable groups.
The present case concerns an employment regulation affecting association between MDOC employees and a large class of persons, most of whom are not prisoners and over the majority of whom, the relatives and visitors of offenders, the state enjoys no enhanced regulatory power. Therefore, in general there is no prisoner nexus, but there always is an employment nexus. As the state’s regulatory power springs from the employment nexus, the proper analytical framework is Pickering, not Turner. Even as far as the Rule is applied against associations between MDOC employees and prisoners, the regulation is valid if it is within the state’s power either as an employer or a warden.[6] As we conclude that the state’s power as an employer is sufficient to authorize the Rule, an analysis under Turner is superfluous, even in that minority of cases where it is applicable.[7] The precedents cited by the separate opinion that apply Turner to actions brought by non-prisoners are not to the contrary, because in each case the impinged association or speech was with a prisoner. See Overton v. Bazzetta, 539 U.S. 126, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003) (applying Turner to family member’s right to visit prisoners); Thornburgh v. Abbott, 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) (applying Turner to publisher’s right to send magazines to prisoners); Keeney v. Heath, 57 F.8d 579, 581-82 (7th Cir.1995) (applying Turner and Thornburgh to regulation barring prison guards from marrying prisoners).[8]
*1044 At first glance, it may seem strange that the state would have powers to regulate the conduct of its employees, generally law-abiding citizens, in ways that were they exercised over prisoners, generally convicted criminals, would constitute a constitutional violation. Surely any regulation that would under Turner violate the Constitution, if applied to prisoners, must a fortiori do so if applied to state employees? Yet, that is not always true, because state employee regulations have a lesser constitutional impact than prisoner regulations because they merely place a limited, voluntary burden on the exercise of a right, rather than impose an outright ban. State employment, in contrast to incarceration, is voluntary and while state employees do not waive their constitutional rights, accepting state employment involves a modicum of consent to regulation that is not present for prisoners. Moreover, while punishment for the violation of an employee regulation extends only up to discharge, punishment for the violation of a prisoner regulation extends up to lengthened incarceration. For these reasons, some conduct that could not be enjoined or prohibited for prisoners can be for state employees. So for example, the state can extract pledges to support the Constitution from employees and licensees (such as members of the bar), but cannot do so from prisoners.
Ill
For the foregoing reasons, the district court’s judgment is AFFIRMED.

. A policeman "may have a constitutional right to talk politics, but he has no constitutional right to be a policeman.” McAuliffe v. City of New Bedford, 155 Mass. 216, 29 N.E. 517, 517 (1892) (Holmes, J.).

. Plaintiffs also cite some older Supreme Court precedents containing broad and aspirational language regarding the Free Speech rights of public employees. See, e.g., Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); United States v. Robel, 389 U.S. 258, 265-66, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); Keyishian v. Bd. of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). As these cases cover the same ground as the more recent and specific Supreme Court precedents relied upon herein, we need not here decide the older cases’ present vitality.

. The plaintiffs complain that the MDOC has not here laid out a carefully reasoned defense of the interest underlying the Rule and the relationship between these interests and the Rule. However, under rational basis review, a "profferred explanation for the statute need not be supported by an exquisite evidentiary record; rather we will be satisfied with the government's 'rational speculation’ linking the regulation to a legitimate purpose, even 'unsupported by evidence or empirical data.’ ” Craigmiles v. Giles, 312 F.3d 220, 224 (6th Cir.2002) (quoting FCC v. Beach Communications, 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)). The burden is on those who challenge the statute to “negative every conceivable basis that might support it.” Craigmiles, 312 F.3d at 224 (quoting Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 364, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973)).

. This conclusion is also in agreement with the only decision of a sister circuit examining similar polices, even under a heightened standard. Ross v. Clayton County, 173 F.3d 1305, 1310-11 (11th Cir.1999) (upholding, under Pickering balancing test stipulated to by the parties, Georgia Department of Corrections regulation prohibiting contact between its employees and offenders).

. The plaintiffs object to the application of Montgomeiy, characterizing it as a mere anti-nepotism case. However, given that Montgomery concerns a restraint on the same freedom of intimate association at issue here, relies to a large extent on the same case law as used by the plaintiffs, and in its reasoning does not depend on the specific features of the anti-nepotism rules, it is a highly relevant precedent.

. To hold otherwise would create the counter-intuitive result that the state has the power to prevent some employee associations only with the general population, but not with prisoners.

. The fact that plaintiffs here are employees of the state agency charged with the oversight of prisoners is only marginally relevant. Our analysis would be substantially the same with respect to a regulation affecting other vulnerable state employees. For example, state-employed armored car guards by the same analysis might be barred from associating with offenders, either directly or through offenders’ family members or visitors, solely for the purpose of protecting the state’s cash and without any alleged penological interest.

.In one Seventh Circuit case, the court applied Turner to an action by a prisoner to enforce the First Amendment right of prison *1044 guards to write to the prison review board in support of clemency petitions. Shimer v, Washington, 100 F.3d 506, 509 (7th Cir.1996). While we believe that such petitions are more properly analyzed under the framework of Pickering, rather than Turner, we note that Shimer only found standing based on the association between guards and prisoners and based its application of Turner on the fact that this underlying association occurred "within prison walls.” Id. at 508-09. The associations at issue here did not occur within these confines, rendering Turner inapplicable.