NOT RECOMMENDED FOR PUBLICATION
File Name: 18a0454n.06

**No. 17-4301**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| CYNTHIA CARPENTER-BARKER, as next friend on behalf of Megan Carpenter, | ) ) ) | **FILED**<br>Aug 31, 2018<br>DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| OHIO DEPARTMENT OF MEDICAID; DIRECTOR BARBARA SEARS, in her official capacity, | ) ) ) ) | |
| Defendants-Appellees. | ) ) ) | |

BEFORE: SILER, MOORE, and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

Ohio's Medicaid program provides to plaintiff's disabled, adult daughter in-home nursing care. Plaintiff sued defendants, alleging their continual attempts to reduce the number of nursing hours placed her daughter at risk of institutionalization and failed to provide services in as integrated a setting as possible, in violation of the Americans with Disabilities Act and the Rehabilitation Act of 1973. The district court granted summary judgment in favor of defendants. Because we agree that plaintiff failed to raise any genuine issue of material fact on her discrimination claims, we affirm.

I.

This lawsuit follows numerous state-agency proceedings involving the proper level of medical care Megan Carpenter should receive. By all accounts, Megan is gravely ill. She suffers from a panoply of serious conditions, most concerning among them her "sub-cortical myoclonus (a short-circuiting that occurs in the brain-stem and that triggers seizure activity)," which can be life threatening if unidentified and left untreated. Moreover, Megan is substantially immobile; presents with self-injurious behavior, outbursts, and aggression; is nonverbal; and is wholly unable to care for herself. Megan's conditions have been lifelong, complex, progressive, and potentially fatal. As a result of these serious and life-threatening conditions, Megan's physician has continually ordered that she receive 24/7 nursing care.

Megan lives with her mother, plaintiff Cynthia Carpenter-Barker, and receives various forms of government assistance to help defray the costs of the large amount of care she requires. One major form of assistance is the "Individual Options" program offered by defendants, the Ohio Department of Medicaid and its director Barbara Sears. This program "provides home and community-based services to people with developmental disabilities who would otherwise require institutionalization." Megan also receives private duty nursing services provided through the Medicaid State Plan, which is administered by defendants.

Under Ohio law, private duty nursing hours must be pre-authorized every year. *See* Ohio Admin. Code 5160-12-02.3(D). Before 2008, defendants authorized Megan to receive 24/7 private duty nursing care, as ordered by her treating physician. That year, however, defendants attempted to reduce Megan's authorization for services from 168 to 112 hours per week. Megan successfully challenged this evaluation through the state-agency process and retained her 168 weekly hours of private duty nursing.

In 2009, defendants again tried to reduce Megan's private duty nursing hours to 112 per week. This time, the state hearing officer found defendants' decision to reduce the private duty nursing hours reasonable. Plaintiff and Megan appealed that decision to the Administrative Appeal Section of the agency, and the appeals panel found 112 hours of private duty nursing care insufficient and that Megan required 128 weekly hours of private duty nursing. The appeals panel determined that Megan did not require a private duty nurse for 40 hours during the week because she attended a workshop during normal work hours; but the panel reasoned that nursing care was still necessary for the other 128 hours of the week.

In 2010, defendants again tried to reduce Megan's nursing hours to 112 per week. Megan again appealed defendants' initial determination, and the state hearing officer dismissed her appeal, agreeing with defendants that the reduction in private duty nursing hours was supported by the evidence. Megan again appealed to the Administrative Appeal Section, which overturned the state hearing officer's decision and found the 128 weekly hours she had been receiving to be medically necessary.

The next assessment, in 2012, authorized 128 weekly hours of private duty nursing for Megan, and it went unchallenged. But the following year, 2013, defendants authorized only 56 weekly hours of private duty nursing care. At the subsequent hearing, defendants argued that Megan received "128 hours for [private duty nursing] services, 62 hours for ["Individual Options"] services, 32 hours of workshop services, and this total is 222 hours; while total hours during 7 days is 168 hours (24 hours x 7)." Defendants reasoned that the services were duplicative, and that personal care aides could perform most of the tasks performed by nurses. Ultimately, the state hearing officer agreed with defendants' assessment that 56 weekly hours of private duty nursing services were sufficient.

Plaintiff appealed this determination to the Administrative Appeal Section, which vacated the state hearing officer's decision and remanded for additional fact-finding. On remand, the state hearing officer again recommended that Megan's appeal be overruled. Responding to the specific remand instructions given, the state hearing officer found that the "Individual Options" aides are legally allowed to administer Megan's prescription medications in the event of a seizure and the agency could allow the aides to do so. On this basis, the state hearing officer agreed with defendants' recommendation that Megan receive 56 weekly hours of private duty nursing care. The state hearing officer did not, however, allow plaintiff and Megan to present any documentary evidence or witnesses at this second hearing.

Plaintiff again appealed this determination to the Administrative Appeal Section. The appeal panel found that the state hearing officer violated Megan's due process rights by refusing to consider her additional evidence at the remand proceeding. The panel vacated the decision and "remand[ed] the matter for a further state hearing to answer the questions we previously posed and carefully consider and analyze all the evidence presented including that from the Agency as well as Appellant." After this second remand, the state hearing officer again found that that "Individual Options" aides are legally allowed to administer Megan's prescription medications in the event of a seizure, and that the agency could allow the aides to do so. Though plaintiff's county Board of Disability Determinations stated that aides would need additional training to administer her medications, the county board planned to initiate conversations with Megan's physician to reasonably facilitate the reduction in private duty nursing hours to accommodate the change. The state hearing officer again recommended that Megan's appeal be overruled.

Plaintiff again appealed to the Administrative Appeal Section, arguing that the state hearing officer erred in concluding that "Individual Options" aides could administer Megan's medications.

The appeal panel held that, under Ohio Administrative Code § 5123:2-6-03, non-nursing aides could administer medications, and the law also allowed nurses to delegate such tasks to the aides. That said, the panel "agree[d] with the hearing officer that until the aides are appropriately trained to administer [Megan]'s medication, [her] private duty nursing hours should not be reduced." Therefore, the appeals panel affirmed the decision of the state hearing officer but held that enforcement of the order, and the reduction in private duty nursing hours, could not commence until certified aides were trained and in place to administer Megan's medications.

Plaintiff appealed this final agency decision to the Butler County, Ohio, Court of Common Pleas. On August 18, 2014, the parties entered into a settlement agreement, agreeing to dismiss the case. In this settlement, defendants agreed not to reduce Megan's private duty nursing hours from 128 hours per week, subject to future assessments. The parties also agreed, consistent with the ruling of the Administrative Appeal Section, that no certified aide could administer Megan's medication unless they met all the requirements of Ohio Administrative Code § 5123:2-6-03, nor could they administer any "as needed" medication, "unless the prescribing order is written with specific parameters precluding independent nursing judgment."

Two months after the settlement, defendants again evaluated the medical necessity of Megan's services, and recommended a reduction of private duty nursing hours, from 128 to 56 per week, to begin on December 1, 2015. Plaintiff requested another state hearing to contest the assessment, but filed this lawsuit before the completion of those proceedings. In her federal complaint, she alleged that defendants violated Megan's procedural due process rights, the Americans with Disabilities Act (ADA), and the Rehabilitation Act of 1973.[1] Plaintiff requested

---

[1]The district court dismissed as moot plaintiff's due process claim at the judgment-on-the-pleadings stage because plaintiff explicitly limited the scope of that claim to defendants' 2014 reduction of private duty nursing hours and the parties subsequently agreed not to reduce her hours

that the district court declare that defendants had violated both the ADA and the Rehabilitation Act, enjoin defendants from continuing to violate Megan's due process rights, enjoin defendants from continuing to discriminate against Megan on the basis of her disability, and award plaintiff reasonable attorneys' fees and costs. Defendants agreed to maintain Megan's existing services during the pendency of the federal lawsuit, so plaintiff withdrew her request for a state hearing on the most recent assessment.

After discovery, the parties filed cross-motions for summary judgment. The district court ultimately agreed with defendants, granted their motion for summary judgment, and determined that plaintiff's ADA and Rehabilitation Act claims were meritless. The court also denied plaintiff's requests for injunctive relief relating to future evaluations of the medical necessity of Megan's private duty nursing hours, because the responsibility for such evaluations had been shifted by law from defendants to the Ohio Department of Developmental Disabilities, thereby mooting plaintiff's claim. However, the district court did grant plaintiff's subsequent motion to stay the judgment and for a preliminary injunction pending appeal. Plaintiff now appeals.

II.

We review the grant of summary judgment de novo. *Keith v. Oakland Cty.*, 703 F.3d 918, 923 (6th Cir. 2013). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "To prevail, the nonmovant must show sufficient evidence to create a genuine issue of material fact, which is to say, there must be evidence on which the jury could reasonably find for the nonmovant.'" *Sumpter v. Wayne Cty.*, 868 F.3d 473, 480 (6th Cir. 2017) (internal quotation

---

in that year. Plaintiff does not challenge the district court's dismissal of her due process claim on appeal.

marks and brackets omitted). All evidence and inferences therefrom must be viewed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

III.

On appeal, plaintiff argues that the district court erred in granting defendants' summary judgment motion regarding her ADA and Rehabilitation Act claims and denying her a permanent injunction on mootness grounds. We address each in turn.

A.

Section 504 of the Rehabilitation Act provides, in pertinent part, that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Similarly, Title II of the ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The ADA provides that "[t]he remedies, procedures, and rights set forth in [§ 505 of the Rehabilitation Act, 29 U.S.C. § 794a,] shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title." 42 U.S.C. § 12133; *see also Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 905 (6th Cir. 2004). In other words, the remedies, procedures, and rights available under Title II of the ADA parallel those available under the Rehabilitation Act. *See, e.g.*, *Olmstead v. L.C.*, 527 U.S. 581, 606 n.16 (1999); 42 U.S.C. § 12134(b) (providing that regulations promulgated under the ADA shall be consistent with the Rehabilitation Act).

Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1);

*see also PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674 (2001). The ADA's prohibition of discrimination in services, programs, or activities "encompasses virtually everything that a public entity does." *Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998). Within the ADA, Congress granted the Attorney General the authority to promulgate regulations necessary to its implementation, 42 U.S.C. § 12134(a), which "are entitled to 'controlling weight, unless they are arbitrary, capricious, or manifestly contrary to the statute.'" *Johnson*, 151 F.3d at 570 (quoting *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843–44 (1984)). One such regulation known as the "integration mandate" provides that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). An almost-identical regulation promulgated under the Rehabilitation Act requires recipients of federal funds to "administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 41.51(d).

Though plaintiff's complaint alleged violations of both the ADA and the Rehabilitation Act, the district court was correct to rule that the complaint presents "essentially one claim"—that defendants put Megan at risk of institutionalization by attempting to reduce her private duty nursing hours in violation of the Supreme Court's *Olmstead* opinion and the ADA's and the Rehabilitation Act's integration mandates.[2]

---

[2]To the extent that plaintiff's arguments on appeal encompass both an integration claim and a typical claim of disability discrimination, she waived the latter by stipulation below. In that joint stipulation, the parties agreed that plaintiff and Megan did not "intend to seek any relief other than" "a declaration from the Court that Defendants' actions in proposing to reduce the number of hours of [private duty nursing] services authorized for [Megan] through the State Medicaid plan in 2014 places her at risk of institutionalization in violation of the ADA and Section 504," "an order from the Court requiring Defendants to reimburse the cost of providing [Megan] with the amount of nursing services she needs to prevent institutionalization or a risk of institutionalization," and "an order from the Court requiring Defendants to refrain from attempting

In *Olmstead*, the two plaintiffs were intellectually disabled women who had been institutionalized for psychiatric care at a Georgia hospital. 527 U.S. at 593. Both the plaintiffs' psychologists (who were employed by the state) recommended that the plaintiffs be "treated appropriately in a community-based setting," but they nevertheless remained institutionalized. *Id*. They filed suit, alleging that their confinement in a segregated environment violated the ADA. *Id*. The Supreme Court agreed, holding that "[u]njustified isolation . . . is properly regarded as discrimination based on disability." *Id*. at 597; *see also id*. at 600. The Court noted that this determination, based in the language of the ADA, "reflects two evident judgments"—first, institutional placement of individuals who could benefit from community settings perpetuates assumptions that such isolated persons are unworthy of participation in community life, and second, confinement in an institution diminishes the life activities and enjoyment of such individuals. *Id*. at 600–01. Thus, the Court held that unwarranted institutionalization was discriminatory under the ADA because it required persons with mental disabilities to relinquish participation in community life in order to receive needed medical services. *Id*. at 601.

But the Court also explained what did *not* violate the integration mandate. The Court held that a state is entitled to "rely on the reasonable assessments of its own professionals in determining whether an individual 'meets the essential eligibility requirements' for habilitation in a community-based program." *Id*. at 602 (quoting 42 U.S.C. § 12131(2)). The Court also cited favorably *School Board of Nassar County v. Arline*, 480 U.S. 273, 288 (1987), for the proposition that "courts normally should defer to the reasonable medical judgments of public health officials,"

---

to reduce the number of hours of nursing services authorized for [Megan] unless or until [Megan]'s treating physician determines that her medical conditions have improved such that her need for nursing services is reduced . . . ." This stipulation limits plaintiff to *Olmstead*-type integration claims, and we are bound by this stipulation. *Varga v. Rockwell Intern. Corp.*, 242 F.3d 693, 699 (6th Cir. 2001).

*Olmstead*, 527 U.S. at 602, and concluded that there was no genuine dispute over whether the plaintiffs should have been granted community-based, noninstitutional care, because the defendants' "own professionals determined that community-based treatment would be appropriate for [the plaintiffs], and neither woman opposed such treatment." *Id*. at 603. Finally, the Court cautioned that it was neither imposing a standard of care on the states nor holding that the ADA required states to provide a certain level of benefits to disabled individuals. *Id*. at 603 n.14.[3] Instead, the states must only "adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide." *Id*. In sum, *Olmstead* requires that states accommodate qualifying individuals by allowing them to receive their treatment in an integrated setting; it does not set a standard of care or specifically require that states offer all the aid a patient wants.

In the present case, plaintiff's claims of discrimination are analogous to that which the Supreme Court held the ADA does *not* require. Plaintiff has not alleged that defendants discriminated against Megan by offering certain services in an institutional setting but not in a community-based setting. Megan's care—at least what is at issue in this case—has been offered in her own home. Instead, defendants have done what *Olmstead* specifically allows: they "rel[ied] on the reasonable assessments of [their] own professionals" in determining what amount of private duty nursing care Megan requires. *Id*. at 602; *see also Arline*, 480 U.S. at 288. In other words, plaintiff's claim fails because the ADA does not "impose[] on [defendants] a 'standard of care' for whatever medical services they render," nor does it "require[] [defendants] to 'provide a certain

---

[3]Medicaid does require that states that enter into a partnership with the government to provide medical assistance to low-income families must provide certain baseline levels of care. *See* 42 U.S.C. § 1396a(a)(10)(A). But neither party alleges that Ohio's Medicaid system falls below this baseline level.

level of benefits to individuals with disabilities.'" *Olmstead*, 527 U.S. at 603 n.14 (citation omitted).

The parties presented the district court with voluminous records reflecting the individualized determination defendants made regarding the reduction in Megan's private duty nursing hours. And while plaintiff has found much to protest about defendants' medical judgments and determinations of medical necessity, none of that rises to the level of discrimination proscribed by the ADA and discussed in *Olmstead*. *Id*. at 600–01; *see also id*. at 603 n.14. In general, individualized and fact-specific determinations of a disabled person's medical needs, will not constitute impermissible discrimination, and are in fact required under the ADA. 42 U.S.C. §§ 12131(2), 12132; 28 C.F.R. § 35.130(d); *Olmstead*, 527 U.S. at 602. The state agency proceedings that the parties have engaged in for years are better suited to address plaintiff's challenges to defendants' medical judgment in seeking to lower Megan's private duty nursing hours. Absent evidence of discrimination under the ADA and Rehabilitation Act, or a violation of the integration mandate, the district court correctly granted summary judgment in favor of defendants.

And though plaintiff cites several sister-circuit cases applying *Olmstead* for the proposition that the risk of institutionalization can support a valid claim of discrimination under the ADA, the district court correctly distinguished each. Each of those cases involved a broader policy that happened to increase the risk of one or more individuals' institutionalization, not a one-off needs assessment. *See Pashby v. Delia*, 709 F.3d 307, 313, 315, 322–24 (4th Cir. 2013); *M.R. v. Dreyfus*, 697 F.3d 706, 723–24 (9th Cir. 2012); *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 602–03 (7th Cir. 2004); *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1178–79 (10th Cir. 2003); *Townsend v. Quasim*, 328 F.3d 511, 513–14 (9th Cir. 2003). While these cases provide

reasonable applications of *Olmstead*'s holding, they do not address what occurred here—an individualized determination by a state's professionals of the proper level of care a single disabled individual required. Though we need not decide whether an individualized determination can ever support a claim under *Olmstead*, the individualized determinations here do not evince the sort of discriminatory animus necessary to bring such a claim. Plaintiff has failed to present a jury-submissible claim under *Olmstead*, and the district court properly entered summary judgment in defendants' favor.

B.

Turning to plaintiff's challenge to the district court's denial of a permanent injunction on mootness grounds, we also find no basis for reversal.

"A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). This "actual controversy" requirement must exist at all stages of the litigation. *Alvarez v. Smith*, 558 U.S. 87, 92 (2009). "A defendant's voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 174 (2000). But "[a] case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id*. at 189 (quoting *United States v. Concentrated Phospate Exp. Ass'n*, 393 U.S. 199, 203 (1968)). We have also noted that "cessation of the allegedly illegal conduct by government officials has been treated with more solicitude by the courts than similar action by private parties . . . . [S]uch self-correction provides a secure foundation for a dismissal based on mootness so long as it appears genuine." *Mosley v. Hairston*, 920 F.2d 409, 415 (6th Cir. 1990) (quoting *Ragsdale v. Turnock*, 841 F.2d

1358, 1365 (7th Cir. 1988)). That said, the party arguing that a change in law moots a case still has a heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to recur. *Akers v. McGinnis*, 352 F.3d 1030, 1035 (6th Cir. 2003).

*Akers* is particularly on point. In that case, the Michigan Department of Corrections argued that the plaintiffs' challenges to its prior administrative rule were mooted by a change to that rule. *Id.* This court, however, declined to find mootness and held that there was "no guarantee that [the Michigan Department of Corrections] will not change back to its older, stricter Rule as soon as this action terminates." *Id.* This was so because rulemaking authority in that area of the law lay solely with the defendant. *Id.* The same is true here. Rulemaking authority pertaining to the administration of Medicaid and Medicaid funds has been granted solely to the Director of the Ohio Department of Medicaid. Ohio Rev. Code § 5162.02. Therefore, it is not clear that the regulatory change of the agency responsible for authorizing private duty nursing, *see* Ohio Admin. Code § 5160-12-02.3(D) (Jul. 1, 2017) (requiring the Ohio Department of Developmental Disabilities, rather than defendants, to now administer private duty nursing requests), suffices to moot this claim. Even though defendants are not currently performing the private duty nursing authorizations, there is no obvious reason why the court could not still enjoin defendants from decreasing Megan's weekly private duty nursing hours in the future—though the utility of such an order under current Ohio law seems limited at best, given that defendants are not responsible for assessing such requests.

But, even assuming the district court erred in finding plaintiff's claims for injunctive relief moot, plaintiff has not met her burden of proving a right to a permanent injunction on the merits. Because the district court correctly held that defendants did not discriminate against Megan under the ADA or the Rehabilitation Act by reducing her private duty nursing hours, plaintiff failed to

establish actual success on her claim. *See Am. Civil Liberties Union of Ky. v. McCreary Cty., Ky.*, 607 F.3d 439, 445 (6th Cir. 2010). Without either establishing a violation or showing that any hypothetical violation of the ADA and Rehabilitation Act would continue, plaintiff's claims merit no permanent injunction. *Id*. And the specific relief plaintiff requested—that defendants be prevented from reducing Megan's private duty nursing hours below the 128 per week she previously received unless authorized by her treating physician—would violate Ohio law, which requires the state agency to determine medical necessity. *See* Ohio Admin. Code § 5160-12-02.3(D)(2). Federal law explicitly allows this procedure. 42 C.F.R. § 440.230(d) ("The agency may place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures."). For these reasons, plaintiff's claims for a permanent injunction are meritless.

IV.

We affirm the judgment of the district court.